## Hooks Smelting Company v. Planters' Compress Company.

### Opinion delivered March 5, 1904.

1. Contract—breach—special damages.—To render one liable for damages for the breach of a contract which arise from special circumstances, and are so large as to be out of proportion to the consideration agreed upon, it must appear, not only that he knew of such special circumstances, but also that he at least tacitly consented to assume the particular risks arising therefrom. (Page 283.)

2. Special damages—notice.—A manufacturer of an article cannot be held liable for special damages for failure to furnish the article within the time agreed if at the time he fixed the price for making the article he had no notice of the circumstances from which the special damages might arise. (Page 288.)

3. Contract—waiver of performance.—A manufacturer who agreed to deliver an article of machinery within a certain time will not be rendered liable by failure to do so where the delivery was subsequently postponed for an indefinite time by consent. (Page 289.)

4. SALE—COUNTERCLAIM.—In a suit by a manufacturer to recover the price agreed to be paid for an article of machinery ordered for a specific purpose, where such article proved to be worthless for the desired object, the purchaser may, by way of counterclaim, recover the amount required to replace such article with other machinery of the kind the contract called for.    (Page 292.)

5. DAMAGES—STOPPAGE OF BUSINESS PLANT.—The right of a purchaser of an article of machinery needed to run a business plant to recover special damages on account of the stoppage of such plant by reason of the fact that the article did not comply with the contract is limited to the reasonable rental value of so much of the plant as was so stopped for such time only as was necessarily required to make and replace such article.    (Page 292.)

6. SAME—DELAY DUE TO PURCHASER.—The manufacturer of an article of machinery ordered for a specific purpose, but which proved unsuitable therefor, cannot be held liable for the time lost by the purchaser in experimenting, instead of promptly taking steps to replace the article.    (Page 293.)

7. SAME.—Where an article of machinery ordered for a specific purpose did not fit, but could have been trimmed down to fit, the purchaser cannot recover special damages for the closing down of its business by reason of the delay in replacing the article if such article was ruined by him in attempting to trim it down in an improper manner. (Page 293.)

8. SAME—TIME ALLOWED TO REPLACE ARTICLE.—A compress company, entitled to recover of a manufacturer special damages on account of the closing of its business for want of an article of machinery which it had ordered of such manufacturer, but which failed to serve the purpose for which it was ordered, cannot recover the rental value of its plant during the time required to procure the article from a distant place, if it did not appear that the manufacturer had notice that it could not be replaced at some nearby town.    (Page 293.)

9. SAME—RIGHT TO RECOVER WAGES PAID DURING ENFORCED IDLENESS.— Wages paid to unemployed hands during the period of idleness enforced by the failure of a manufacturer to supply an article of machinery within the time agreed cannot be recovered as an element of damages for breach of the contract, in the absence of proof that such manufacturer had notice that a breach of its contract would cause the payment of such wages.    (Page 294.)

10. INSTRUCTION—WHEN TOO GENERAL.—In an action to recover the price for making an article of machinery, where defendant counterclaimed special damages growing out of the idleness of its plant on account of delay in delivering the article, the court instructed the jury that if they found that at the time of making the contract special circumstances were imparted to plaintiff by defendant from which defendant

would probably sustain a greater loss than usual by plaintiff's failure to carry out its contract, defendant was entitled to recover, in addition to ordinary damages, such damages as in the light of the special circumstances were reasonably within contemplation of the parties, and which might be ascertained with reasonable accuracy. *Held,* that the instruction was too general. (Page 294.)

11. SAME—WHEN MISLEADING.—Where there was a conflict in the evidence as to whether certain measurements furnished by defendant were for the purpose of determining the measurement of the machinery ordered or for the purpose of testing its alignment merely, an instruction which assumed that the purpose of the measurements was the former was properly refused. (Page 295.)

Appeal from Phillips Circuit Court.

HANCE N. HUTTON, Judge.

Reversed.

STATEMENT BY THE COURT.

The Planters' Compress Company was the owner of a cotton compress at Helena in this state. In this compress there is what is called a "worm" and a "sector," each of which are necessary to the operation of the compress. The worm, which is a short spiral or screw made to revolve on a shaft, was used to drive the sector; the threads of the worm being geared into the teeth or cogs on the rim of the sector, so that, when the worm revolved, power was transmitted to the sector. This rim of the sector, called a segment, to which the cogs were attached, was made separate from the body of the sector, so that, when the cogs wore out or broke, another segment with cogs could be fitted to the sector. As the segments on the sectors were worn, and the worms were also worn and broken, it was necessary to have them replaced with new ones. So on the 3d day of January, 1898, the manager of the compress addressed the following letter to the Hooks Smelting Company of Philadelphia:

"We are needing one or two bronze screw worms for our Campbell press, and have been informed by the former manager of the press that you made the worms for him. Please inform me if you still have the moulds, if you can make them, and at what figure. These worms are required to stand great strain, and have to be made of a peculiar phosphor bronze. If you have

not the patterns, we could send you one of the old worms.  We have three of the old worms, and would probably want you to take them.  *  *  *

. "L. Burton."

The smelting company on January 6, replied through its secretary that it would furnish the phosphor bronze castings in the rough at 18 cents per pound f. o. b. Philadelphia, and allow 9 cents for the old screw worms delivered in Philadelphia.  He also stated that the company could not make the castings from the old worms, but said, "You will have to furnish us with a pattern, or we can, if you desire, have the same made at our expense."  To this letter Faulkner, the secretary of the compress company, replied that the company wanted to know what the casting would cost ready to put on the shaft, stating that "we have had considerable trouble in getting this metal to the proper temper; one firm made it too soft, and another too hard."  To this Cempini, secretary of the smelting company, answered that "we could not make an estimate of cost of pattern making and furnishing without first seing the old worm."  Afterwards the compress company shipped some of its segments and worms to the smelting company, and about the first of July the president and secretary of the compress company called at the office of the smelting company, in Philadelphia, and explained to the secretary of the company the nature of the casting wanted.  As the compress company desired to contract for completed castings ready to be put up for use, and as the smelting company only made rough castings, it could not at that time name a price for the pattern making and machine work, as that was work that would have to be done by other parties.  A machinist and pattern maker were afterwards called in, but the machinist desired some other measurements, and so the matter was postponed to a later date; it being agreed that the machinist would make a drawing of the machinery, with blank places indicating measurements desired, and would forward the same to the secretary of the compress company, at Helena, who would have measurements made and return.  This was done, and on July 21 the secretary returned the drawing, with measurements, and requested the smelting company to make a bid on two bronze castings, "one right and one left; also upon eight segments, four rights and four lefts."

On August 3 the secretary of the smelting company wrote the compress company, and quoted prices on the machinery as requested. The prices on the worms being stated as follows: "Phosphor bronze worm castings in the rough as quoted January 6, 1898, at 18 cents per pound."

To this letter the secretary of the compress company replied as follows: "Your letter of 3d, offering prices on work formerly left there is received, and the prices are satisfactory. You will begin work immediately, and rush to completion. * * * We must have them as soon as possible."

The smelting company, by its secretary, replied on 10th of August as follows: "We are in receipt of your valued favor of 6th inst. and note contents; for which accept thanks. It is impossible just to state a definite date when the castings will be shipped, as it depends a great deal upon the pattern maker and machinist; but we will hurry the work, and make shipment with all possible dispatch."

No reply was made to this letter, but on the 2d day of September the compress company telegraphed as follows: "Wire immediately when compress machinery was shipped." The smelting company replied that it was impossible to fix a definite date, that the patterns would be ready next week, and that "we are hurrying as much as possible." To this the compress company replied that the receipt of the message had "thrown much confusion in the camp," and urged them to spare no expense in rushing the work.

The remainder of the correspondence need not be referred to here. The castings were shipped on the 30th of September, and received in Helena on the 7th of October. The worms proved to be too great in diameter to go under the arms of the compress. It was claimed by plaintiff that this defect was due to error in the measurement furnished by defendant, while defendant claimed that they had ordered the worms to be made the same size of the old worms shipped to plaintiff, but that plaintiff made the body of the worm straight, instead of slightly concave, so as to conform to the curve of the rim of the sector, as the old worms were made. Some idea of this difference may be had by reference to illustration of Hindley's screw in Webster's or the

Century Dictionary. After some correspondence with the smelting company, the compress company, on 8th of November, ordered new worms from St. Louis. These worms were shipped on the 13th of December, and the compress started again about the 20th of that month. The compress company refused to pay the smelting company for the worms made by it, on the ground that they were too large and worthless, and on the 28th of February, 1899, the smelting company began this action to recover the sum of $520.87, balance claimed to be due for the work done by it.

The itemized statement filed with the complaint is as follows:

| | | |
|---|---:|---:|
| 2 Phosphor bronze castings | $259 | 02 |
| 8 Iron castings | 128 | 38 |
| 2 Worm patterns and coil box | 70 | 00 |
| 2 Segment patterns and coil box | 115 | 00 |
| Finishing 2 worms and 8 segments | 124 | 00 |
| Merchandise | 16 | 35 |
| Total | $712 | 75 |
| Credit by old worms | $191 | 88 |
| Balance sued for | $520 | 87 |

The plaintiff charged 18 cents per pound for old worms in the rough, and allowed credit for metal in old worms at 9 cents per pound.

The compress company filed an answer and counterclaim in which it alleged that the worms were not made in accordance with the contract of plaintiff, and were too large and worthless, and it asked, among other items of damage, the amount paid employees while compress was idle on account of defect of worms, and for rental value of compress, and for other items, amounting in all to $7,322.50.

The plaintiff filed a reply to this counterclaim, and on the trial the court among others gave to the jury the following instruction relating to the measure of damages, at request of defendant:

"If the jury finds from the evidence that at the time of the making of such contract special circumstances were imparted to the plaintiff by the defendant, and that said special circumstances

disclosed to the plaintiff that the probable loss which would acrue to the defendant by reason of the failure of the Hooks Smelting Company to carry out its said contract would be other and greater than would accrue in the usual order of things from a breach of such contract, then the defendant is entitled to recover of the plaintiff, in addition to those damages which would naturally and ordinarily flow from the breach of the contract in the usual course of things, such damages as, in the light of such special circumstances so disclosed to the plaintiff, were reasonably within contemplation of the parties to such contract at the time of the making thereof, and which damages may be ascertained with a reasonable degree of accuracy."

The court refused to give the following instruction No. 7 requested by plaintiff:

"The jury are instructed that if they find from the testimony that the worms and segments contracted to be made by plaintiff for defendant were constructed according to measurements furnished by said defendant, and were of proper material, they will find for plaintiff, although they further find that, after the same were so constructed, they proved to be entirely worthless."

But the court modified the instruction by inserting immediately after the word "measurements" the words "worms, segments and other information," and gave it as modified, to which modification the plaintiff excepted.

There was a verdict and judgment in favor of the defendant for the sum of $5,450, from which judgment plaintiff appealed.

*P. O. Thweatt,* and *Rose, Hemingway & Rose,* for appellant.

Appellant is not responsible for the delays of the independent contractors who made the patterns and smoothed the rough castings. 53 Ark. 503; 55 Ark. 510. Appellee cannot hold appellant liable for the breaking of the segments, because it gave specific directions that they be made of iron. 4 Allen, 274. Appellant constructed the worms according to specific measurements and directions, and is not responsible for their failure to work. 52 Pac. 496, s. c. 120 Cal. 228; 9 Dana, 358, s. c. 35 Am. Dec. 141; 41 N. W. 338, s. c. 73 Wis. 416; 26 Atl. 869; 21 Atl. 306, s. c. 140 Pa. St. 28; 70 Ill. 128; 54 N. Y. Super. Ct. 411; 58 Ill. App. 663; 39 Atl. 583; 74 Fed. 160; 54 N. E. 661, s. c. 160 N. Y. 72; 65

Fed. 466; 86 Fed. 359; 37 Atl. 544, s. c. 181 Pa. St. 530; 4 Allen, 268, 274; 30 Ill. App. 393; 68 Ia. 56; 28 Atl. 780, s. c. 160 Pa. St. 317; 20 Atl. 857, s. c. 53 N. J. L. 59; 105 Fed. 413; 43 N. E.. 203; 165 Mass. 373; 55 Ark. 148. The court erred in refusing the second and eighth instructions asked for the appellant, to the effect that, if it was not informed that the worm worked in a housing, it was not responsible if it was too large.   52 Ark. 45; 50 Ark. 545; 51 Ark. 88. The court erred in refusing the seventh instruction as asked by appellant, and in giving same as modified. The instruction as to the measure of damage was erroneous, because it specified no rule for admeasurement of same.   2 Thompson, Trials, § 2060; 7 Exch. 407; 9 Exch. 341. The evidence was too vague and uncertain to sustain the damages assessed. *Cf.* 48 Ark. 502; 9 Exch. 341. Remote or speculative damages should not be allowed.   57 Ark. 203; 55 Ark. 329; 34 Ark. 707; 58 Ark. 29; 65 Ark. 537; 21 Ark. 431; 34 Ark. 184; 36 Ark. 518, 524; 1 Gr. Ev. § 261; 2 W. N. C. 689, s. c. 24 Pittsb. L. J. 19, s. c. 33 Leg. Int. 322; 48 Pa. 309; 51 Pa. 165; 2 Del. 60, 247; 71 Pa. 350; 65 Pa. 199; 91 Pa. St. 92; 35 Pa. 107; 135 Pa. St. 132, s. c. 19 Atl. 1008; 48 Pa. 407, s. c. 13 Pittsb. L. J. 173.

*M. L. Stephenson,* and *Jno. J. & E. C. Hornor,* for appellee.

There was no error in the court's instructions. The instructions as to the nature and extent of damages recoverable met the requirements of the rule in *Hadley* v. *Baxendale,* 9 Exch. 341. If the special circumstances under which a contract is made, and which will govern the damages which will flow from its breach, are communicated to the party undertaking same, he will be held liable for such damages growing out of such breach.   39 Fed. 440; 16 N. Y. 494; 47 Wis. 455; 1 Suth. Dam. 79; 130 U. S. 622; 64 Fed. 70; 92 Fed. 294; 34 N. Y. 634; 24 N. E. 341; 101 N. Y. 205; 60 N. Y. 487. See also, generally, upon these principles: 69 Ark. 219; 16 N. Y. 489; 3 Barb. 424; 130 U. S. 622; 33 Mo. App. 377.

Riddick, J. (after stating the facts). This is an action brought by the Hooks Smelting Company of Philadelphia against the Planters' Compress Company of Helena to recover $520.87

as the price of two bronze worms and other castings which plaintiff made for the defendant company. The defendant set up, among other things, that the plaintiff was informed that the worms were needed by the 1st day of September, and that unless they were received the compress could not be run, and great loss would result to the defendant, and that the plaintiff thereupon agreed that it would ship the worms on or before the 1st of September, but that it failed to ship them until the 30th of that month, and that when they were received they proved to be too large to go under the sector or arms of the compress, and for that reason were worthless, and that, as a result of the failure of the plaintiff to make the worms in accordance with the directions given it, and to deliver them as it agreed to do, defendant's compress was stopped for several months, and defendant was put to considerable expense in other ways, the loss aggregating, in all, the sum of $7,322.59, for which it asked judgment. The result of the trial was that, while plaintiff asked judgment for the sum of $520.87, judgment was rendered against it for the sum of $5,450.

An examination of the bill of particulars filed with the complaint in connection with the evidence will show that the profits which the plaintiff might reasonably have expected to make on this contract did not probably exceed one or two hundred dollars, for we must remember that its business was smelting, and that the pattern making and finishing which make up nearly half the bill were done by other parties, upon whose work it does not appear that plaintiff expected any profit. We are not saying that these parties were not, under the facts of this case, in some sense agents or employees of plaintiff, so as to make it responsible for the character of their work. We are simply calling attention to the fact that it does not appear that plaintiff was to get a profit on their work, except by securing the contract to do the casting required, and that on the whole contract its expected profits did not probably exceed the amount named. And yet for the failure to properly perform this contract plaintiff is subjected to damages nearly ten times greater than the gross amount to be paid it for all the materials it furnished. While the fact that the damages are greater than ordinarily follow the breach of contracts to furnish materials of that value does not show that the judgment

is wrong, it calls attention to the case as one somewhat out of the beaten track of damage cases, and we therefore proceed with some interest to examine the law and the evidence upon which the judgment is based.

The rule of law by which the defendant undertakes to support this judgment was first laid down in the case of *Hadley* v. *Baxendale*, 9 Exch. 341. In that case the plaintiffs were the owners of a steam mill. The shaft was broken, and they gave it to the defendant, a carrier, to take to an engineer, to serve as a model for a new one. On making the contract for shipment, the agent of the carrier was informed that the mill was stopped, and that the shaft must be sent immediately. He delayed its delivery, and in an action for a breach of the contract the owners of the mill claimed as specific damages the loss of profits while the mill was kept idle. It was held that, if the carrier had been informed that a loss of profits would result from delay on his part, he would have been answerable. But as, in the opinion of the court, it did not appear that he knew that the want of the shaft was the only thing which was keeping the mill idle, he could not be made responsible to such an extent. Now, we feel some doubt as to whether the learned court did not in that case refuse to follow its own rule. The court, it will be noticed, said that, if the agent of the carrier had been told that the mill could not run until the shaft was returned, and if that was the only cause for stopping the mill, the carrier would have been liable. But was not all this implied in what was told the agent? He was told that the mill shaft was broken, and the mill stopped, and that the shaft must be delivered to the engineer immediately, so that a new one could be made. It would seem that this was sufficient to give the agent notice that the stopping of the mill was the result of the broken shaft, or at least be sufficient to support a finding of a jury to that effect. If we look at what the court actually decided in that case, it seems itself to support the modification, subsequently engrafted in the rule as stated in that case, to the effect that mere notice is not always sufficient to make one liable for special damages. This modification we will notice further on.

Mr. Mayne in his work on damages says of this case of *Hadley* v. *Baxendale* that it has been supposed to lay down three

rules in respect to the recovery of damages. "First, that damages which may fairly and reasonably be considered as naturally arising from the breach of the contract, according to the usual course of things, are always recoverable. Secõndly, that damages which would not arise in the usual course of things from a breach of contract, but which do arise from circumstances peculiar to the special case, are not recoverable unless the special circumstances are known to the person who has broken the contract. Thirdly, that where the special circumstances are known, or have been communicated to the person who breaks the contract, and where the damage complained of flows naturally from the breach of the contract under those special circumstances, then such special damage must be. supposed to have been contemplated by the parties to the contract, and is recoverable." Mayne on Damages (1st Am. Ed.), § 14.

Now, the first two rules laid down by the decision in *Hadley* v. *Baxendale* have never been questioned or doubted, but the third rule, the one we are asked to enforce in this case, has often been criticised, and many cases could be cited where the courts have refused to apply it so broadly as stated in the principal case, for if thus applied it would in many cases result in obvious injustice. Suppose, for instance, that a large manufacturing establishment is driven by power from a single engine, and that, by reason of an accident to some small but important part of the engine or machinery, it becomes necessary to stop the operation of the whole plant until a new part can be made or the old one repaired. If thereupon a blacksmith or machinist is called in, and, for the price of a few dollars, undertakes to make the repairs, but through some mistake or unskillfulness the part supplied by him should fail to fit, requiring it to be remade and entailing still further delay, would any court hold that the blacksmith or machinist could be held liable for all the damages entailed by the delay when they were large, in the absence of a contract on his part to be thus liable, unless the notice and the circumstances under which he made the contract were such that he ought reasonably to have known that in the event of his failure to perform his contract the other party would look to him to make good the loss? Theoretically, under the third rule, as stated in *Hadley* v. *Baxendale,* the blacksmith, if he had notice, would be liable.

but we know of no decision that has gone to that extent, but there are many cases in which such exorbitant claims for damages have been denied by the courts, on the ground that it would be clearly unjust to allow them.

In the case of *Fleming* v. *Beck,* 48 Pa. St. 309, a millwright was employed to dress two pairs of burr mill stones at $16 a pair.    He afterwards brought suit to recover the price, and the owner of the mill for defense alleged that the work was unskillfully done, and he claimed damages.    In deciding the case on appeal the court said:    "A very small part of the machinery of a mill or factory may be so essential to its running that the want of it will stop operations until this part be mended or replaced, causing a large loss by suspension.    But who has ever supposed that the blacksmith, millwright or mechanic who undertakes to repair or replace it, and whose compensation may be a few dollars, or even a few cents, is, by his implied contract to do his work in a workmanlike manner, to be held liable for the large losses of being idle?    But few men could be found to work at a risk so great for compensation so inadequate.    But where, by the terms of the special contract or the facts brought into view at the time of his employment, the attention of the party is called to the fact that the risk is to be his, and he enters upon the duty with this consequence in his mind, he may be held to another measure of compensation."

It seems then that mere notice is not always sufficient to impose on the party who breaks a contract damages arising by reason of special circumstances, and the reason why this is so was referred to in a recent decision by the supreme court of the United States.    In that case Mr. Justice Holmes, who delivered the opinion of the court, after remarking that one who makes a contract usually contemplates performance, not a breach, of his contract, said:    "The extent of liability in such cases is likely to be within his contemplation, and whether it is or not, should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind." *Globe Refining Co.* v. *Landa Oil Co.,* 190 U. S. 540.

Now, where the damages arise from special circumstances, and are so large as to be out of proportion to the consideration

agreed to be paid for the services to be rendered under the contract, it raises a doubt at once as to whether the party would have assented to such a liability had it been called to his attention at the making of the contract unless the consideration to be paid was also raised so as to correspond in some respect to the liability assumed. To make him liable for the special damages in such a case, there must not only be knowledge of the special circumstances, but such knowledge "must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it." In other words, where there is no express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part. Wills, J., in *British Columbia Sawmill Co.* v. *Nettleship,* L. R. 3 C. P. 235; *Globe Refining Co.* v. *Landa Oil Co.,* 190 U. S. 540; *McKinnon* v. *McEwan,* 48 Mich. 106; *Snell* v. *Cottingham,* 72 Ill. 161; *Horne* v. *Midland R. Co.,* L. R. 8 C. P. 131; *Booth* v. *Mill Co.,* 60 N. Y. 487; Wood's Mayne on Damages (1st Am. Ed.), p. 50; 1 Sutherland on Damages, § 52; 8 Am. & Eng. Enc. Law (2d. Ed.), 593.

Now, considering that the agent of plaintiff who made the contract had never seen the compress, and considering the large excess in the amount of the damages claimed against plaintiff for failing to perform its contract over the consideration agreed to be paid for making the worms, we feel confident that, if plaintiff had been told that any mistake on its part, or on the part of the pattern maker or machinist employed by it, might render it liable for the value of the use of the compress during the time of any delay caused by such mistake, it would never have undertaken the work without an additional consideration for taking such a risk. But the question of whether notice of the special circumstances proved in this case was given to the plaintiff in such a way as to show that plaintiff knew or should have known that, in case of failure to carry out its contract, the defendant would reasonably expect it to make good the special loss sustained, and the plaintiff accepted the contract under such

conditions, is a question, not of law, but of fact. Where one has full knowledge or notice of special circumstances which may cause special damages to follow if the contract is broken, the fact that he accepts the contract under such circumstances is generally held to be sufficient evidence to support a finding of a court or jury that he did so knowing that, in the event of his failure to perform his contract, the other party would reasonably expect that he should make good the loss incurred by reason of the special circumstances where such loss flows naturally from the breach of the contract under such special circumstances. Wood's Mayne on Damages (1st Am. Ed.), p. 50. But each case of this kind must rest on its own merits, and the findings of the jury upon the facts may be reviewed as in other cases, and will be set aside when justice requires that it be done.

Having stated what seems to us the correct rule of law that should govern the question of damages in this case, let us look at the facts to see whether they support the findings of the jury. The secretary of the compress company testified that he and the president of the company went to Philadelphia, and had an interview with the secretary of the smelting company on the 30th day of June, 1898. At that time they explained to him fully the construction of the compress, and told him that the compress could not be operated without the worms, and that the business of the entire plant would be stopped until the worms could be made. He further stated that at that time the smelting company had already made a price on the castings, and that the price had been accepted on the part of the compress company by letter, but that no price had been made as to the patterns and finishings, for the reason that this work was to be done by outside parties. The letters and actions of the parties tend to support the testimony of the secretary of the defendant that before he went to Philadelphia the plaintiff and the defendant had agreed on the price of the work, and that this price was to be the prices quoted for the bronze castings, as stated above, and, in addition thereto, such sum as might be required for pattern making and machine work. The reason for leaving the price of the patterns and machine work open was that the plaintiff did not do work of this kind at its own shop, but had to hire it done by outside parties. But it is clear, we think, that if the price of these bronze

screw worms was fixed, so far as plaintiff was concerned, before the interview at Philadelphia took place between the agents of the parties, there is no ground upon which this judgment for special damages can stand. For it is well settled that, in order to make a party to a contract liable for special damages, he must have notice of the special circumstances at or before the making of the contract. He must, at the time he receives notice of the facts showing that upon a breach he will be subjected to special damages, be free to insist on such additional compensation as he may choose to demand. But if the price for the work, or for the part in which he is most interested, has been fixed, so that he must go ahead with his contract, then notice of the circumstances will have no effect to enlarge his liability. *Globe Refining Co.* v. *Landa Oil Co.,* 190 U. S. 545.

We will now notice another phase of this matter. It seems that when these parties met on the 30th of June both of them expected that the work would be commenced at once. One of the witnesses for defendant present at that interview testified that the plaintiff agreed that the work should be completed and delivered not later than the 1st day of September. The other witness for the defendant testified that the delivery should be made not later than the 15th of September. There thus seems to be some discrepancy between the testimony of these witnesses for the defendant, but it is probable that one of these witnesses was speaking of the delivery on the cars in Philadelphia, and the other was speaking of the delivery at Helena. The secretary of the plaintiff, who was present at that interview, testified that he made no promise to deliver at any particular time; that the parties representing the plaintiff told him that it was necessary for the machinery to be in Helena at the opening of the cotton season, which he understood was about the 1st of October, and that he told them he would do the best that he could; that he explained to them that the time required to make the machinery depended to a large extent on the pattern maker and machinist, and that on that account he could not name an exact date on which he could complete the work. However, as neither Cempini, the secretary of the smelting company, nor Faulkner, the secretary of the compress company, was a practical machinist, and as it was necessary to consult a machinist and a pattern maker about

S C—10

making the patterns, it was agreed between the two parties that, if it was found that further information was ·wanted before the work could commence, Faulkner should be notified at New York, where he expected to stay awhile, so that he could return to Philadelphia, and give the information desired. It turned out that more information was needed, and in a few days Faulkner was notified, and returned to Philadelphia, and had a second interview with Cempini, at which a machinist and pattern maker were also present. On this interview it developed that Faulkner could not give all the measurements desired, and it was agreed that the machinist would make a sketch or drawing of the worm and sector, and indicate thereon the measurement he desired, and that this sketch would be sent to Faulkner, the secretary of the defendant, at Helena, and that he would have the measurements made, and write them on the sketch, and then return it to the plaintiff for the use of the machinist. There is a conflict in the testimony as to the purpose of getting these additional measurements. Faulkner, the secretary of the compress company, testified that it was only to test the alignment of the compress, to see if some defect in that respect was the cause of the trouble with the worms. On the other hand, the machinist, Faulkinau, testified that the measurements were needed in order to determine the distances from centers, so that he could tell what the dimensions of the worm should be, and that he so told Faulkner, the secretary of defendant. Whatever may be the truth about this matter, it is certain that both parties understood that the making of the worms was suspended until these measurements were obtained. The sketch was sent to Faulkner, at Helena, and in his letter of July 21, returning same, he said: "I return you herewith sketch of machinery with measurements inserted as asked for in your letter. * * * Please make me a bid on two bronze castings, one right and one left; also upon eight segments, four right and four left. * * * I want this work rushed, and hope you will rush me reply, and if it is satisfactory I will wire you to proceed with work, as it will save two days' time. I hope this will be all the information required, and that the work will not be delayed longer than necessary." The smelting company replied, quoting the prices on phosphor bronze worms in the rough, as before given, and in addition stating the

price for the patterns and segments, and saying the price for finishing could not be given exactly, but that it would probably be about $100. On the 6th of August the compress company replied by letter saying: "Your letter of the 3d offering prices on work formerly left there is received, and prices are satisfactory. You will begin the work immediately, and rush to completion." On the 10th of August the smelting company acknowledged the receipt of the letter as follows: "We are in receipt of your valued favor of the 6th instant, and note contents, for which please accept thanks. It is impossible just to state a definite date when the castings will be shipped, as it depends a great deal upon the pattern maker and machinist; but we will hurry the work and make shipment with all possible dispatch." No reply or objection was made to this letter, and defendant either assented to the terms contained in it, or led plaintiff to believe that it did. A consideration of these letters and the testimony makes it quite plain that, if the plaintiff ever agreed to deliver this machinery on any certain day, it did so when the parties first met, and when they both believed that there was no obstacle in the way of commencing the work at once. But the postponement of the work for an indefinite time by consent necessarily abrogated the promise to complete the work by the 1st of September, if such promise was made. The parties not only recognized this, but they seem to have treated the contract of June 30 itself as abrogated. This is put beyond controversy by the letters of the defendant from which we have quoted above.

It would be obviously unjust to hold plaintiff to his promise made on the 30th of June to deliver the machinery by the 1st of September, when both parties afterwards consented that the work should be delayed over a month. At the time he made the promise he had two months in which to complete his contract, but when the order was renewed he had only one-third of that time. Certainly, the defendant did not expect to hold plaintiff to this promise to deliver the machinery by the 1st of September, for, if it did, why did it, on returning the sketch with the required dimensions, request a new quotation of prices, thus intimating that in its opinion the contract was not closed, and that plaintiff must wait for further orders before proceeding with the work? This letter was written on the 21st of July, and the order directing

plaintiff to proceed with the work was not written until the 6th of August; thus showing that defendant, by treating the contract of June 30 as abrogated and insisting on another quotation of prices, itself caused a loss of sixteen days. The machinery was shipped on the 30th of September, and, if we deduct the sixteen days, the loss of which is directly traceable to the act of defendant itself, we shall see that but for this act the machinery could have been shipped on the 14th of September. As the president of the company testified that the cotton season did not open until the 15th of September, it is very plain that defendant would have suffered little, if anything, by the delay in the shipment, but for its demand for another quotation of prices—a demand which is utterly inconsistent with its contention that the contract of June 30th was still in force. We feel, therefore, no hesitation in saying that defendant is entitled under the proof here to no damages on account of the delay in the delivery of the machinery, unless it be shown that the plaintiff failed to exercise due diligence in the making of the machinery after it received the order mailed by defendant on the 6th of August.

We will next inquire as to what damages the defendant may recover on account of defects in the machinery made by plaintiff, assuming that the evidence is sufficient to sustain a finding that these worms were not made in accordance with the directions given. If the fact that these worms would not go under the sector, and were therefore useless for the purpose required, was the fault of the plaintiff, and due to its failure to carry out its contract, then defendant would be entitled to recover on its counterclaim against plaintiff the amount required to replace the defective worms with other worms of the kind the contract called for. This amount, less any value received by defendants from the worms furnished by plaintiff, should go as a credit on the claim of plaintiff; and if the amount of these damages exceed the claim, the defendant would be entitled to recover the excess.

As to the special damages claimed, assuming that defendant has made out a case for special damages under the law referred to, those damages should be limited to the reasonable rental value of so much of the compress plant as was stopped through the failure of plaintiff to perform its contract for a time long enough for plaintiff to replace the bronze worms. We confine this to the

replacing of the worms, for the reason that the worms are the only part of the machinery made by plaintiff which defendant claims to be defective.  Some of the segments broke, but it was said in argument by counsel for defendant that this was caused on account of defects in the worms.  The evidence in the record here is not quite clear as to whether, in the absence of the worms, there was any usable value to any part of the compress plant or not.  The company in its businsss charged for storage as well as for compressing; and if the warehouses of the defendant had still a usable value, that value should not be charged against plaintiff.  Only the rental value of that part of the plant, the use of which was necessarily lost on account of the failure of plaintiff to make the worms as he agreed to do, should be charged to him under any circumstances.

Again, the defendant can only be charged with the rental value only for the time necessarily required by defendant, acting with due diligence, to replace the defective worms.  The time lost by defendant in attempting to use these defective worms, or damage caused thereby, cannot be charged to plaintiff, for he did not know or consent that the defendant should experiment by cutting down and using worms that were obviously unsuited to the work.  There is some intimation in the testimony that, with a proper lathe, the worms could have been reduced in diameter and made to fit, but that defendant ruined them by attempting to cut them down in an improper way.  If this had been proved, of course the facts would have called for a very different judgment, for, if defendant ruined the worms by its own act, it could not hold plaintiff responsible for a result which it brought about itself.

Nor do we think that plaintiff can, under the facts in proof, be charged with the rental value of the plant, or any part of it, during the time required for the new worms to return from a distant place, for there is nothing to show that plaintiff had any notice that these worms could not be replaced at Helena or Memphis or some other nearby town.  The fact that the order for the worms was placed in Philadelphia does not show that the worms could not have been procured in Helena or in Memphis, for some people prefer the foreign market.  The fact that one does not patronize a home industry does not prove that there

are no home industries. If a lady of Little Rock orders a gown in Paris, that does not prove that gowns are not made in Little Rock. While it may be that the making of bronze worms is not quite so universal as the making of gowns, still most towns of any importance now have facilities for making such castings, and, as it was not shown that plaintiff had notice that the castings could not be replaced at Helena, its responsibility for the rental value of so much of the plant as was lost by its failure to perform its contract must be limited to the time reasonably required to make and replace the defective worms.

Nor does the evidence show that plaintiff had notice that a breach of its contract and a stoppage of the compress would cause the defendant to pay out wages to unemployed hands in order to retain them in its service, and, in the absence of such proof, evidence of the amount of such loss was improper, and should have been excluded, for, under the evidence as found in the record, there is no reason to believe that such damages were within the contemplation of the parties at the time the contract was made.

As to the instructions, it will only be necessary to say a few words. The instruction on the measure of damages seems to us to be much too general in its nature. In closing his opinion in the case of *Hadley v. Baxendale, supra,* to which counsel on both sides have referred, Alderson, B., said: "The judge, ought, therefore, to have told the jury that, upon the facts then before them, they ought not to take the loss of profits into consideration at all in estimating the damages." In other words, he held that the charge of the court should have been more specific. So, in this case the presiding judge should have instructed the jury that under the facts proved nothing could be allowed the defendant on account of delay in delivery, unless the evidence showed that plaintiff failed to use due diligence in making the machinery after it received the order to go ahead with the work. He should also have told them that no damages for stoppage of compress after delivery could be allowed beyond the rental value of that part of the compress which was necessarily stopped until new worms could be obtained, and then only for the time reasonably required to make and replace the worms. As the order for the new worms was made on the 8th of November, and the worms

were completed on the 13th of December following, it can be seen that less than a month and a half was all the time required for that purpose.

The law in reference to the circumstances under which special damages may be allowed was given to the jury in instructions 5 and 6, as requested by counsel for appellant, and it has no right to complain of the charge in that respect. The court, we think, committed no error in refusing the instructions asked by plaintiff, for each of them was more or less defective. Take, for instance, instruction No. 7, which is copied in the statement of facts. It assumes that the measurements furnished by defendant were furnished for the purpose of determining the dimensions of the worms and segments, whereas there was a conflict in the testimony on that point. A witness for defendant testified that those measurements were not furnished for the purpose of showing the dimensions of the worms, but only for the purpose of testing the alignment of the compress machinery. If this was the purpose for which the measurements were furnished, and if plaintiff, without consulting defendant, used these masurements in determining the dimensions of the worms, and thereby made them too large, it should suffer the consequences. On the other hand, if the defendant was informed that other measurements were needed to properly construct the worms, and thereupon undertook to furnish and did furnish measurements for that purpose, and if the plaintiff constructed the worms in accordance with such measurements, and the measurements proved to be incorrect, and for that reason the worms were made too large, and were not suited for the purpose intended, then, if the worms were in other respects properly made, and would have been suitable for the purpose intended, but for the error in measurements made by defendant, plaintiff would be entitled to recover the contract price, notwithstanding such defect, for the blame for that would under those circumstances rest on defendant, and not on plaintiff.

It follows from what we have said that if defendant directed plaintiff to make the body of the worms slightly concave, as the old worms were made, so as to conform to the curve of the segment into the teeth of which the threads of the worms were to be geared, and if plaintiff disregarded this direction, and made the

body of the worms straight, and if the failure of the worms to fit and go under the arms of the compress was due to this fact, and not to any error in measurements sent by defendant, then the consequences would rest on plaintiff, and not on defendant.

In conclusion, we must say that not only was the instruction on the measure of damages too general, but the damages assessed by the jury seem to us clearly excessive. And, notwithstanding the very able brief and argument of counsel for defendant, we are of the opinion that under the facts in proof it would be very unjust to allow a judgment for such a large amount of damages to stand. The judgment is therefore reversed, and a new trial ordered.