CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY *v.* PLAN-

TERS' GIN & OIL COMPANY.

Opinion delivered October 19, 1908.

1.  CARRIERS—DELAY—SPECIAL DAMAGES.—Although a carrier is compelled to accept freight tendered for shipment, and cannot make any special contract to compensate it for assuming the additional risk that the notice of special damages to flow from the failure to promptly deliver such freight would place upon it, it will still be liable for special damages fairly attributable to its failure to make such delivery with-

in a reasonable time, if notice of the special damages was given to it at the time the shipment was made.   (Page 83.)

2.   SAME—TO WHOM NOTICE OF SPECIAL DAMAGES SHOULD BE GIVEN.— Where one, desiring to ship freight, applied at a carrier's freight office, and was referred to a certain person, with whom he entered into a contract for shipment, notice of special damages to accrue from delay in the shipment was properly given to such person, in order to bind the carrier.   (Page 86.)

3.   SAME—TIME OF DELIVERY OF FREIGHT.—Where a bill of lading does not fix the time within which freight is to be transported, the law implies that the delivery shall be made within a reasonable time, in view of the circumstances, taking into account the mode of conveyance, the nature of the goods, the season of the year, the character of the weather, and the ordinary facilities for transportation under the control of the carrier.   (Page 87.)

4.   SAME—SPECIAL DAMAGES—BREACH OF CONTRACTS.—A carrier which has failed to deliver freight within a reasonable time is not thereby rendered liable to the shipper for special damages by reason of contracts broken by him on account of such delay if the contracts were entered into after the contract of shipment was made.   (Page 87.)

5.   SAME—LIABILITY FOR LOSS OF PROFITS.—A shipper cannot recover special damages for delay in shipping machinery on account of a saving of expense, such damages being too remote and speculative.   (Page 89.)

6.   SAME—DELAY IN CARRYING MACHINERY—DAMAGES.—The question whether a shipper may, on account of the carrier's delay in delivering machinery, recover damages for its "fixed expenses" while shutting down its mill depends on whether at the time the machinery was due the fixed charges against the mill were less than at the time when the machinery was received, so that the cessation of business during the installation of the machinery would be more expensive than at the earlier time, and also upon whether this damage was called to the carrier's notice at the time of shipment.   (Page 89.)

7.   SAME—COST OF DUPLICATING MACHINERY.—When, on account of delay of a carrier in shipping machinery, the shipper was compelled to purchase a second set of machinery, he is entitled to recover the cost of the duplicated machinery, less the value of the delayed machinery utilized to its best advantage.   (Page 89.)

8.   SAME—DELAY IN SHIPMENT—CONVERSION.—A carrier is not liable for conversion of freight on account of its delay for an unreasonable time in making a delivery thereof.   (Page 90.)

Appeal from Pulaski Circuit Court, Second Division; *Edward W. Winfield,* Judge; reversed.

STATEMENT BY THE COURT.

The Planters' Gin & Oil Company was engaged in the manu-
facture and sale of cotton seed products at Baldwin, Mississippi.
Its plant was a one-press mill. It was desired to increase its
capacity to a two-press mill, and Mr. Justin Matthews was au-
thorized by it to purchase in Little Rock, Arkansas, a cylinder,
a head block, a pressing ram and heavy castings for a cotton seed
oil plant. Matthews did so, and drew a draft in favor of the
vendor for $500, the price of the machinery, which was paid by
the oil company. He had the bill of lading made out and went
to the freight depot of the Chicago, Rock Island & Pacific Rail-
way Company to ship the machinery over said road to Baldwin,
Mississippi, where the plant was located. The shipment was an
interstate shipment, and would have to go over connecting lines.
R. E. Palmer was the local freight agent at Little Rock, and he
had 35 or 40 clerks under him in his office. The bill clerk, E.
A. Bliss, and the chief clerk, G. A. Swope, and himself were au-
thorized to sign bills of lading, and were the only employees of
the company in said office so authorized. Mr. Matthews was
not acquainted with the clerks or their duties. He went to the
freight office, and handed the bill of lading to one of the clerks,
who pointed out another man as the one with whom he should
transact his business. He went to this man and explained
his business, and he took the bill of lading, went off with
it, and presently returned with it duly signed. It was signed "R.
E. Palmer by B." It subsequently developed that it was signed
by Mr. Bliss, and Mr. Bliss was not the man with whom Mr.
Matthews was transacting the business. Mr. Matthews stated
to this gentleman who handled the bill of lading for him that he
wanted the railroad company to accept the shipment with the
understanding that the oil company was to have a reasonable
delivery of the machinery. He stated to him that delay in the
shipment would be cause for damages, and said that the oil com-
pany had requested him to state that they had time contracts
made for oil and meal, and that in case of a decline in the market
they would be damaged for that cause, and that they would also
be damaged by reason of the additional expense of handling the
seed by hand. He also stated that they would be damaged by
reason of the seed heating and making an inferior grade of oil

and meal and a less quantity of oil produced from it, and that they would not have room to store the seed, and would buy in anticipation of increasing the capacity of the mill, and in the meantime would have to operate a one-press mill. The agent made no reply to this, but after hearing this statement he took the bill of lading and went away, and presently came back with it signed.

This was upon the 8th of September, 1906, and the machinery was shipped out of Little Rock on the following day. It was received at Baldwin, Mississippi, on October 29. The oil company refused to receive it and left it on the platform of the railroad. It was testified to, and not disputed, that seven to ten days was a reasonable time to allow for the transportation of machinery from Little Rock to Baldwin, Mississippi.

The oil company brought suit against the railroad company for $4,987.50, and set forth nine elements of damages, towit:

"1.   The plaintiff was forced to buy another set of articles described, in Atlanta, Georgia, and pay $500 therefor, because it could not complete its mill, after waiting upon defendant for a long time.

"2.   The plaintiff, expecting to receive said machinery and complete its mill and manufacture products in a reasonable time, made contracts for the sale of oil, which it was forced to cancel by defendant's wrongful act and pay $375 to the parties who had bought said oil.

"3.   The plaintiff could not manufacture the seed in its seed house, and, having, in anticipation of reasonable conduct on defendant's part, contracted for seed more than enough to fill said seed house, was compelled to pay hauling and storage on the same in the sum of $100.

"4.   The seed in the house of plaintiff was kept there an unreasonable length of time, and heated and deteriorated, thus making an inferior quality of oil, and damaging plaintiff in the sum of $100.

"5.   The seed in the house of plaintiff was kept there an unreasonable length of time, and heated and deteriorated, and resulted in the manufacture of an inferior grade of meal, thus damaging plaintiff in the sum of $375.

"6.   The plaintiff was put to increased cost of fuel by reason

of having to run its boilers and engines when the mill was not up to full capacity, and was thus damaged in the sum of $137.50.

"7.   The plaintiff could only operate one press of its mill for a part of the time, and was thus damaged in the sum of $200.

"8.   The plaintiff was damaged by the shutting down of its mill in the sum of $300, this being the fixed expenses for such period in salaries.

"9.   The seed, being heated from being stored an unreasonable length of time, produced less oil than they otherwise would, and the plaintiff was thereby damaged in the sum of $750."

The 6th ground was withdrawn by plaintiff during the trial. The jury returned a verdict of $2,375, and the railroad and the oil company each appealed. On the trial, in addition to the testimony above outlined, the following evidence was given: The president of the oil company testified that they commenced purchasing cotton seed about the latter part of September. By the 19th of October they had purchased from 800 to 1,000 tons at from $15 to $18 per ton. They had capacity to store from 1,000 to 1,500 tons in their seed house. He testified as to the depreciation in the oil and meal producing qualities of seed and in the quantity of oil produced therefrom by reason of the delay in handling it, the seed becoming heated when they were unable to work it promptly through the mill. Some time in the latter part of September or the first of October he made a contract with Armour & Company for oil, to be delivered the last of October, and could have fulfilled the contract, had this machinery arrived in time. Armour & Company called on them for the oil, and they could not deliver it, and they effected a compromise of the breach of their contract by paying Armour & Company $375. He also testified that they expended $100 in having to store their seed in a shed some four or five blocks from the oil mill. He stated that a two-press mill can run for almost as little expense as a one-press mill, as it only requires about one more employee to operate a two-press mill, and that there was an accumulation of extra labor which could have been utilized with the two-press mill, and that they lost on that account $200. He further testified that they lost $300 by reason of having to shut down the mill for three weeks while installing new machinery in October which they had purchased elsewhere before the arrival of this ma-

chinery.  He said that the machinery had not arrived at the time that he made his contracts for the seed, and had already been delayed longer than it should have been.  He further testified that he could not rent parts to take the place of the delayed machinery.  On the 18th or 19th of October the oil company purchased elsewhere a duplicate set of machinery at the same price, and it arrived at about the same time that the first machinery did, and they installed the second set of machinery, and did not receive the first and did not pay the freight thereon when it finally arrived, as it could not be used by them nor sold for anything except scrap iron.

Mr. Palmer, Mr. Bliss and Mr. Swope each denied that they received the notice of the necessity of prompt shipment as testified to by Mr. Matthews.  It was evident that none of these gentlemen were the ones with whom Mr. Matthews had the conversation of which he testified.

*Buzbee & Hicks,* for appellant.

1.  No notice was given to appellant nor to any agent of appellant authorized to receive such notice, of any special damages.  A person dealing with an agent of a corporation is bound to ascertain the nature and extent of his authority.  72 Ark. 283; Mechem on Agency, § 289; 62 Ark. 33; 70 Ark. 233; 53 Ark. 209; 65 Ark. 385.  Even if the person to whom Matthews claimed to have given notice had authority to sign bills of lading, it would not follow that he had authority to enter into a contract on behalf of appellant to assume such an extraordinary obligation.  Cases *supra.*  The notice by Matthews, if given, was not sufficient to put defendant on notice as to the special circumstances under which special damages were expected to occur; and the evidence fails to show that appellant entered into the contract understanding such circumstances.  72 Ark. 275; 190 U. S. 540.  The damages in this case are too remote and speculative to form a basis of recovery.  56 Ark. 610; 57 Ark. 207; 129 U. S. 204; 190 U. S. 540.  If appellee's notice was sufficient to entitle it to special damages at all, such damages would be the rental value either of the machinery or of the oil mill.  72 Ark. 287; 77 Ark. 150.

2.  This was an interstate shipment, and the rate was fixed

by the tariffs on file with the Interstate Commission for the shipment of this machinery, and appellant could not lawfully vary therefrom; neither had it any right to make any different contract, nor assume any different liability with appellee, than that assumed with all other parties making interstate shipments. U. S. Comp. Stat. 1901, supplement 1907, p. 897.

*H. M. Armistead,* for appellee.

1. The interstate commerce legislation of Congress is not intended to, and does not, relieve carriers from liability for special damages sustained by shippers. 162 U. S. 197; 145 U. S. 26; 37 Fed. 567; 63 Fed. 775; 81 Fed. 547; 74 Fed. 715; 105 Fed. 703; 167 Fed. 511; 164 U. S. 578; 136 U. S. 507.

2. Matthews offered his shipping receipts, and gave notice to an agent of the company to whom another agent of the company referred him as having authority to attend to contracts of shipment. That was sufficient notice to the company. The law permits of no "sleight of hand" performances in matters of this kind by common carriers to evade responsibility. A shipper contracting with a railroad station agent for the transportation of freight is under no legal obligation to make inquiries concerning the agent's instructions or powers. 57 S. W. 883; 87 Ark. 219; 37 N. E. 280; 107 S. W. 434; Hutchinson on Carriers, §§ 457, 460, 462, 152, 158, 630; 2 Am. Rep. 276; 2 Redfield on Railways, 113.

3. Appellant will be presumed to have known that this machinery was required at its destination for some purpose, and is answerable for the naturally to be expected results of delay; and full notice was given it of all the circumstances attending before the contract of shipment was signed. To hold that the shipper is entitled to the rental value alone of the castings and machinery would be to establish an entirely inadequate measure of damages. 77 S. W. 920; 91 S. W. 1121; 76 N. E. 1050; 1 Q. B. D. 274; 22 Ont. App. 278; 85 Pac. 408; 48 S. E. 961; 104 Tenn. 568; 86 Ark. 179.

HILL, C. J. (after stating the facts). I. Appellant argues that the defendant as a common carrier was compelled to accept this shipment when tendered to it; that, under the "Hepburn Act" of Congress, it had no right to make any special contract to

compensate it for assuming the additional risk that the notice of the special damages to flow from the failure to promptly deliver would place upon it. The cases of *Hooks Smelting Co. v. Planters' Comp. Co.*, 72 Ark. 275, and *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U. S. 540, are relied upon as authorities fixing the principle that, to hold a party to a contract liable for special damages, there must be notice of the special circumstances at or before the making of the contract, so that the party sought to be charged for the breach of the contract may be free to insist on such additional compensation as he may choose to demand, or at liberty to refuse the contract. The argument is not without force, and there is language in these and other opinions applying the doctrine of *Hadley* v. *Baxendale*, 9 Exch. 341, to this effect.

However applicable that doctrine may be where the contract is between parties at liberty to contract, it is inapplicable when applied to the implied contract of carriers, although the same language is frequently used in cases when discussing liability of carriers as when discussing the liability of manufacturers or machinists who enter into contracts to promptly furnish or repair machinery. In fact, *Hadley* v. *Baxendale* was a carrier case itself, but the distinction was not then made. This difference is referred to in *Crutcher* v. *Choctaw, O. & G. Rd. Co.*, 74 Ark. 358. One is a matter of contract, the other is a legal obligation.

The court recently had before it the question of special damages flowing from the breach of the implied contract of a carrier to furnish cars, and, following the authorities, particularly *Vicksburg & M. Ry. Co.* v. *Ragsdale*, 46 Miss. 458, the court sustained such action. *Choctaw, O. & G. Rd. Co.* v. *Rolfe*, 76 Ark. 220. See also *Choctaw, O. & G. Rd. Co.* v. *Crutcher*, 74 Ark. 358, and *St. Louis, I. M. & So. Ry. Co.* v. *Ozier*, 86 Ark. 179. A much earlier case, likewise applying to it, is *St. Louis, I. M. & So. Ry. Co.* v. *Mudford*, 48 Ark. 502. The Ragsdale case, heretofore referred to, which has been approved by this court in the Mudford, Crutcher and Rolfe cases, is a leading authority upon the subject, and has been much quoted and approved by text writers. See 4 Elliott on Railroads, 1731; 3 Hutchinson on Carriers, 1369 (old ed.), 772; 3 Joyce on

Damages, 1960.  On this exact question the Mississippi court said: "6th.  If the delay is in the transportation of machinery to be applied to a special use, and that is known to the carrier, he is responsible for such damages as are fairly attributable to the delay, such as the value of the use of the machinery, to be tested by its rental price, or other approximate means, the expenses of idle hands, the loss or gain on work contracted to be done for another person, if such work could have been done if the machinery had been delivered, and the gain thereby definitely ascertained in proper time.  7th.  The party injured by the delay must not remain supine and inactive, but should make reasonable exertions to help himself, and thereby reduce his losses, and diminish the responsibility of the party in default to him."

Mr. Hutchinson says, in referring to the justice of the rule which gives special damages where the circumstances would make the general rule inequitable: "And if, with a knowledge of these circumstances, the carrier should unreasonably delay the carriage, or if, having expressly contracted to carry them within a given time or for a given purpose, he should negligently delay them beyond that time, or so as to defeat their purpose, the difference in the value of the goods at the time of their actual arrival and at the time when they should have been delivered may prove a very inadequate recompense to their owner."  And again he says:  "The fact that the carrier was notified of the special circumstances demanding greater diligence is thus seen to be a crucial one, and that the carrier was so informed must be both alleged and proved."  3 Hutchinson on Carriers, 1367. See also 4 Elliott on Railroads, § 1724.

While it is true that the carrier cannot refuse to receive goods, and while it may be true that under the recent act of Congress he cannot make any special charge commensurate with his undertaking, yet such consideration can not change his duty to promptly carry.  Notice of the special circumstances puts upon him the duty to use diligence commensurate to the requirements of the case; and he has discharged his whole duty when he uses reasonable diligence to fulfill the implied contract which the law places on him to promptly forward the goods. It would not be consistent with the duties resting on a carrier to

say that where he has broken his implied contract to promptly deliver he can escape responsibility for failing to exercise due care in promptly forwarding goods because he could not refuse the goods when offered, nor charge a different rate than for similar goods shipped without notice. The test of his liability is his care in the execution of his duty, and the amount of damage is dependent upon the nature of the shipment and the circumstances under which it is made. Special damages present no question of liability, but a question of amount of damages where liability is otherwise fixed. The liability is dependent solely upon the negligence of the carrier in the performance of his duty to promptly carry. 4 Elliott on Railroads, § 1712. The exercise of reasonable diligence in forwarding acquits the carrier of negligence and defeats the action based on a failure to deliver within a reasonable time. And in this way the carrier can always protect itself.

II. It is insisted that the notice was not brought home to a person properly representative of the company. The notice was given to the party who actually made the contract of shipment. The company had thirty-five or forty employees in the freight office, only three of whom were authorized to make contracts of shipment. A shipper goes to the office, and is referred to a certain person as the proper one with whom to enter into his contract. He gives his notice to that person, and that person causes to be executed the contract—the bill of lading. It may be that that person did not personally sign it. That fact was not known to the shipper. Nor was it necessary to be known to him. For the man whom the company put forward to transact business did transact it for the company, did enter into the contract, and under the contract so executed the carrier received the goods, and shipped them; and notice to such person was notice to the company.

III. Having determined that the plaintiff has made out a case for special damages, it is necessary then to consider the damages recovered and sought to be recovered. Notice was given to the railroad company that contracts had been made for the purchase of seed by the oil company; but the evidence fails to establish this fact. On the contrary, the evidence of the president of the oil company shows that he only began contract-

ing for the seed in the latter part of September or the first of October; and most, if not all, of the contracts for seed were made in October.

The machinery was delivered to the carrier on the 8th of September, and left Little Rock on the 9th. Under the undisputed evidence, seven to ten days was the usual and reasonable time to allow for its delivery to Baldwin, Miss. Where the time of delivery is not fixed by contract, the law implies the time necessary to complete the transaction. But "the law does not attempt to fix by rule what is a 'reasonable time.' Each case is referred to its own peculiar circumstances, an account being taken of the mode of conveyance, the nature of the goods, the season of the year, the character of the weather, and the ordinary facilities for transportation under the control of the carrier." 4 Elliott on Railroads, 1730. The testimony has fixed beyond dispute that a reasonable time for the delivery of these goods expired not later than the 19th of September. The president of the company says that the machinery had already been delayed an unreasonable length of time before he commenced contracting for seed. No assurance from this railroad company of its speedy arrival was shown. It may be taken under the facts of this case that the machinery was to have been delivered on or before the 19th of September, as if that date had been definitely settled and fixed by contract in the beginning.

The ground upon which special damages are allowed, where contracts have been made and they are breached, is that the carrier has notice of those contracts and the probable effect of the breach of them by reason of the carrier's default in delivery of the shipment in time for the shipper to fulfill his contract. 3 Hutchinson, Carriers, 1367; *St. Louis, I. M. & S. Ry. Co.* v. *Mudford,* 48 Ark. 502. The Massachusetts court, speaking through Mr. Justice Endicott on this subject, said: "If, therefore, the defendant had received the ties for transportation according to its contract, and failed to deliver them at all, it would have been liable for their market value in Boston at the time when they should have been delivered; or, if it had negligently delayed the delivery, it would have been liable for the diminution in their market value during the delay. It would not in either event have been liable in damages for loss of profits sus-

tained by the plaintiff under his subsequent contracts with other parties, unless it can be said that, by reason of the plaintiff's announcement that he intended to make such contracts, it was necessarily within the contemplation of the parties when they made the contract of transportation, and as the probable consequence of its breach, that the defendant might be liable for damages resulting to the plaintiff from his inability to fulfill such contracts, the terms of which were not and could not then be disclosed.

"The damages for which a carrier is liable upon failure to perform his contract are those which result from the natural and ordinary consequences contemplated at the time of making the contract of transportation; and a larger liability can be imposed upon him only when it is in the contemplation of the parties that the carrier is to respond, in case of breach, for special and exceptional damages. In such a case the extent and character of the obligation he assumes should be known to the carrier, which in this case was impossible, as the contracts were not then made. The mere knowledge on the part of the defendant that the plaintiff intended to make contracts for the sale of the ties to be transported cannot impose liability upon the defendant for loss of profits on such contracts. * * * *

"We are therefore of opinion there was error in instructing the jury that the plaintiff could recover damages for loss of profits on his subsequent contracts. As the ties were not sent to Boston, the true measure of damages is the difference between the market price in Boston and the market price in Canada at the time when the defendant should have transported the ties according to its contract, deducting therefrom the price stipulated in the contract for transportation." *Harvey* v. *Connecticut & Passumpsic River Ry. Co.,* 124 Mass. 421.

In this case the contracts were not only subsequent to the notice of the company, but were subsequent to the default of the railroad company.

The second, third, fourth, fifth and ninth elements of damage set forth in the complaint grew out of the contracts made long subsequent to the notice to the carrier, and from ten to thirty days after the carrier had breached the contract by failing to promptly deliver the machinery. A shipper cannot recover damages growing out of contracts made subsequent to the ship-

ment, for it is only such matters as are then in contemplation for which the carrier can be held, and *a fortiori* a shipper cannot recover on account of contracts made after the carrier was already in default in making delivery. It cannot be said that when he made these contracts he was relying upon the carrier to fulfill its obligation, because it was already in default, and the oil company had no assurances from it that its default would be speedily remedied.

The seventh ground seems to be based upon the loss to the company of the saving in expense between a one-press mill and a two-press mill. This is but another form of recovering expected profits from a two-press mill, in that the fixed charges against the two-press mill would have got better results, as some of the hands were idle, while in operating the two-press mill they would not have been idle. This is too remote and speculative to be recoverable.

The eighth item may be recoverable, but it is not sufficiently developed here to definitely determine. If at the time the machinery was due the fixed charges against the mill were less than at the time when the machinery was received, and the cessation of business during the installation of the plant would be more expensive at that time than the earlier time, and if this was necessarily included in the notice, then the difference may well be recoverable.

The first item is recoverable, and the court erred in not giving instruction No. 3 asked by the oil company: "If you find that the plaintiff sustained actual damages by reason of being compelled to purchase a duplicate set of machinery and pay for same, after having paid for the set shipped over defendant's roads, and such damage was caused by the unreasonable delay of defendant in carrying said machinery, if you find there was an unreasonable delay, then the plaintiff is entitled to recover such actual damages as it sustained by reason of being compelled to buy the second set of machinery. You will consider this item of damage apart from the other claims for damage about which you have been instructed."

The oil company has also appealed, and assigns error for the failure of the court to give this instruction and permit it to recover on this item. The oil company waited long beyond the

breach of the contract before purchasing other machinery. The railroad company had sufficient notice of the use for which this machinery was intended and of the consequences which would attend the failure to deliver it to the oil company to make it liable for it for the purchase price of the duplicate machinery obtained elsewhere when it had failed to deliver it within a reasonable time. "It is the duty of the shipper to exercise reasonable diligence and care to minimize the injury to his shipment caused by delay." 4 Eliott on Railroads, 1730. And he "must not remain supine and inactive, but should make reasonable exertions to help himself, and thereby reduce his losses and diminish the responsibility of the party in default to him." *Vicksburg & M. Ry. Co.* v. *Ragsdale,* 46 Miss. 458.

If the goods were absolutely worthless, the shipper could recover the full amount of the cost that he was put to in getting their duplication. *Wabash Rd. Co.* v. *Harris,* 55 Ill. App. 159. But, if they were of value, it was his duty to utilize them to advantage. The machinery was his, and the railroad did not convert it to its own use by its unreasonable delay. 3 Hutchinson on Carriers, § 1372; 4 Elliott on Railroads, § 1710. His measure of damage would be the cost of the duplicated machinery, *minus* the value of the delayed machinery utilized to its best advantage.

The judgment is reversed upon both appeals, and the cause remanded for new trial.

ON REHEARING.

Opinion delivered November 9, 1908.

Hill, C. J. Appellee files a motion for rehearing, and takes issue with the correctness of this statement in the opinion: "The president of the company says that the machinery had already been delayed an unreasonable length of time before he commenced contracting for seed. No assurance from this railroad company of its speedy arrival was shown." Counsel calls attention to the testimony of the witness referred to, wherein he said that they had assurances from the railroad company that the machinery would be there, but when he was asked what company he replied, "Well, it was the company here and the Thomas-

Fordyce Manufacturing Company, and we had asked them to hurry it up." This was all the evidence upon the subject. Counsel say that, as the witness was testifying in Little Rock, it necessarily referred to the defendant railway company.

This testimony was not overlooked in the consideration of the case, as supposed by counsel; but it was considered insufficient to prove any assurance on the part of the defendant railroad company, and insufficient to prove such a definite promise of the speedy delivery of the machinery that a reasonable man could rely upon it. In fact, it was considered so indefinite and uncertain as to amount to nothing, and it was decided to so treat it in the opinion.

The motion is overruled.