## GULF, C. & S. F. RY. CO. et al. v. NELSON.

(Court of Civil Appeals of Texas. San Antonio. April 5, 1911. On Motion for Rehearing, June 7, 1911.)

1. CARRIERS (§ 186*)—FREIGHT — CONNECTING CARRIERS — DELAY—SPECIAL DAMAGE—NOTICE.

A connecting carrier of material for a dam, etc., was chargeable with notice of special damages which would result to the contractor through delay in transportation, where the contract was made by the initial carrier for the benefit of both companies, which were closely related, through its general freight agent, who had such notice.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 790; Dec. Dig. § 186.*]

2. CARRIERS (§ 186*)—FREIGHT—DELAY—SPECIAL DAMAGE—NOTICE.

Under an agreement for carriage of many car loads of construction material to be used for a special purpose of which the carriers had notice, it was unnecessary to repeat such notice on each shipment, to charge the carriers with special damages resulting from delay in transportation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 790; Dec. Dig. § 186.*]

3. CARRIERS (§ 177*)—FREIGHT—CONNECTING CARRIERS—LIABILITY.

Under a joint contract by connecting carriers to transport freight, each is liable for default of the other.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–803; Dec. Dig. § 177.*]

4. CARRIERS (§ 46*) — FREIGHT — INTERSTATE SHIPMENTS—LAWS GOVERNING.

A shipment from a point within to a point beyond the state is not governed by the local laws.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 46.*]

5. CARRIERS (§ 177*)—INTERSTATE SHIPMENTS—CARMACK AMENDMENT—APPLICABILITY.

The federal statute, commonly known as the "Carmack Amendment" (Act June 29, 1906, c. 3591, § 7, 34 Stat. 595 [U. S. Comp. St. Supp. 1909, p. 1166]), making an initial carrier liable under interstate shipments for loss arising on a connecting line, does not apply where the damage is not to the property itself, as where there is a mere delay in carriage.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 177.*]

6. CARRIERS (§ 105*)—FREIGHT—DELAY — NOTICE OF SPECIAL DAMAGE.

Local agents of a carrier receiving a shipment need not be given notice of the special purpose for which the shipment is to be used, in order to charge the carrier for damages resulting from a delay in transportation, where superior traffic officers have such notice.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 105.*]

7. TRIAL (§ 260*)—INSTRUCTIONS—REFUSAL—MATTER COVERED.

Instructions covered by those given are properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

8. CARRIERS (§ 187*)—FREIGHT — DELAY—INSTRUCTIONS—BURDEN OF PROOF.

In an action against carriers for delay in transporting freight, an instruction that, if the connecting carrier did not have notice at or before the time shipments were tendered to it of the purpose for which the material was desired, the connecting carrier was not liable, was not objectionable as placing the burden on that carrier to show want of such notice.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 187.*]

9. CARRIERS (§ 187*)—FREIGHT — DELAY—NOTICE OF DAMAGE—JURY QUESTION.

Whether a connecting carrier of construction material had notice of the purpose for which it was shipped, so as to charge it with special damages resulting from delay in carriage, held, under the evidence, a jury question.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 187.*]

10. CARRIERS (§ 176*)—FREIGHT—DELAY—SPECIAL DAMAGES.

A connecting carrier must use reasonable diligence to transport freight if it receives information before receipt by it of the shipment of the importance of prompt transportation.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 176.*]

11. CARRIERS (§ 185*) — FREIGHT — CONTRACT FOR SHIPMENT—AUTHORITY TO MAKE—EVIDENCE—SUFFICIENCY.

Evidence held to show that the general freight agent of an initial carrier was authorized to contract for a shipment for a connecting carrier.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 185.*]

12. CARRIERS (§ 176*)—FREIGHT—DELAY—LIABILITY.

Carriers' liability for delaying transportation of many car loads of construction material, they having knowledge of the purpose for which it was designed, is not affected because two cars were shipped before publication of a special rate made under the contract, where the shipments showed on their face that they included material to be carried under the contract.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 176.*]

13. CARRIERS (§ 176*) — FREIGHT — DELAY — CONNECTING CARRIERS—LIABILITY.

Under a joint contract by connecting carriers to transport many car loads of construction material for plaintiff to a certain point, their liability for delay in transportation arising from notice of the purpose of the shipments is not affected because some of the shipments originated on a third line.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 766–774; Dec. Dig. § 176.*]

14. CARRIERS (§ 180*)—FREIGHT—CONNECTING CARRIERS—LIABILITY.

Where there was a joint contract by connecting carriers to transport freight thereby making each liable for the other's default, their liability is not affected by provision in bills of lading limiting the initial carrier's liability to delays occurring on its own line.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 815–828; Dec. Dig. § 180.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**15. APPEAL AND ERROR (§ 730*) — ASSIGN-MENTS OF ERROR—SUFFICIENCY.**

An assignment of error to a refusal to instruct that, if material delayed in transportation by defendant carrier was sold to plaintiff at a delivered price at the destination, he was not entitled to recover for the delay, is insufficient as a proposition of law in itself.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3013–3016; Dec. Dig. § 730.*]

**16. CARRIERS (§ 104*) — FREIGHT — DELAY — CAUSE—EVIDENCE—SUFFICIENCY.**

Evidence *held* to show that delay in delivering freight was not caused by the shipper.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 104.*]

**17. APPEAL AND ERROR (§ 1053*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.**

In an action against connecting carriers for delay in transporting freight, it was not prejudicial error to admit testimony for plaintiff that, as soon as informed of starting of shipments, he urged the local agent at the destination to trace the cars, telling him of the necessity of having the shipment, where the instructions limited the effect of notice to its agents to such agent as accepted the shipments.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4178–4184; Dec. Dig. § 1053.*]

**18. CARRIERS (§ 176*)—FREIGHT—DELAY—EXCUSE.**

Carriers having agreed to carry construction material, knowing that the shipper required prompt delivery to fulfill a contract, were bound to give preference to its transportation, notwithstanding unexpected and unprecedented business in general.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 766–774; Dec. Dig. § 176.*]

**19. CARRIERS (§ 185*) — FREIGHT — DELAY — EVIDENCE—SUFFICIENCY.**

In an action against carriers for delay in carrying construction material, evidence *held* to sustain findings that delay in completion of the construction work was not caused by defective machinery, labor troubles, or other matters beyond the carriers' control.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 185.*]

**20. APPEAL AND ERROR (§§ 994, 995*) — REVIEW.**

The weight of evidence and the credibility of witnesses are questions for the jury's exclusive determination.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3901–3907; Dec. Dig. §§ 994, 995.*]

**21. CARRIERS (§ 186*) — FREIGHT — DELAY — DAMAGES—EXCESSIVENESS.**

Seventy-five thousand, two hundred and fifty dollars *held* under the evidence not an excessive recovery against carriers for delay in transporting material for construction of a government dam and canal.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 790; Dec. Dig. § 186.*]

**22. CARRIERS (§ 185*) — FREIGHT — DELAY — DAMAGES—EVIDENCE.**

In an action against carriers for delaying carriage of construction material used under a government contract, the contractor could show that the government engineer refused to extend time for doing the work.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 185.*]

**23. APPEAL AND ERROR (§ 745*)—ASSIGNMENTS OF ERROR—FILING—NECESSITY.**

An assignment of error not shown to have been filed below, nor to have been filed by consent on appeal, will not be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3039, 3042; Dec. Dig. § 745.*]

*On Motion for Rehearing.*

**24. CARRIERS (§ 185*)—AUTHORITY OF AGENT —EVIDENCE.**

Since agency cannot be established by the agent's acts or declarations alone, making of a contract by the general freight agent of an initial carrier on the part of a connecting carrier, does not show his authority to do so.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 185.*]

**25. CARRIERS (§ 185*)—FREIGHT—CONNECTING CARRIERS — AUTHORITY TO EXECUTE JOINT CONTRACTS—EVIDENCE—SUFFICIENCY.**

Evidence *held* to show that an initial carrier of freight was authorized to make a contract on the part of a connecting line for through shipments.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 185.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by J. P. Nelson against the Gulf, Colorado & Santa Fé Railway Company and another. Judgment for plaintiff, and defendants appeal. Affirmed.

Houston, Boyle, Storey & Davis, Terry, Cavin & Mills, and A. H. Culwell, for appellants. Denman, Franklin & McGown, for appellee.

JAMES, C. J. The nature of the petition of J. P. Nelson is substantially: That on or about November 5, 1906, he entered into a contract with the United States government, by which he undertook to construct a dam across the Rio Grande river and other work, including a canal, near Las Cruces, N. M., alleging the terms thereof, among which was that the work was to be commenced within 15 days after November 5, 1906, and completed within five months, the contract price being $143,078.95. That the date of completion was so fixed because thereafter high water in the river would interfere with the work. That immediately plaintiff organized an outfit of the reasonable value and costing $36,000, made arrangements for the work, and, among other things, made out a bill of lumber and material to be purchased from the Spencer Lumber Company, and directed it to ship same to him at Selden, N. M., in the order in which it would be needed. That he fully advised said lumber company of his said contract. That the material ordered was to be used in fulfilling the contract, which was to be completed in said time. That there would be high water after April, 1907, which would retard the work and make same more expensive, and that he directed said lumber company to notify the railway companies of the facts above

set out necessitating prompt shipment. That said Spencer Lumber Company took up the matters with and fully notified defendants of the purposes for which the material was to be shipped and of the danger of high water in the Rio Grande, and its effect on the work and consequent damage to plaintiff if not performed before the period of high water in the river, and that defendants at the time of accepting the material for shipment knew that the Rio Grande river rose every year about the middle of April, and that high water therein would seriously interfere with and damage plaintiff in the performance of his contract. That the Spencer Lumber Company ascertained in its negotiations with defendant companies that the existing freight rate on lumber from the initial points to El Paso was 18 cents per 100, and that the rate from El Paso to Las Cruces, a point 16 miles further distant than Selden, was 16 cents per 100, and that this was a more direct and quicker route for shipments, and requested the shipments to be made via the Southern Pacific, and then over the Atchison, Topeka & Santa Fé Railway Company to Selden for the aggregate rate of 34 cents, but the railway companies refused to make a 34-cent rate via El Paso, but insisted on hauling all the material over their own rails involving a much longer haul which greatly increased the time of transportation, and defendants agreed to make said rate only upon that condition, which was assented to by Spencer for plaintiff, and agreed to transport the material as tendered them in carload lots from initial points to Selden, N. M., at the rate of 34 cents per 100, except such cars as were shipped in November and December, 1906, upon which they refused to make the special rate, and plaintiff paid to defendants the regular rate for the transportation of all cars shipped prior to January 1, 1907, before the special rate went into effect. That thereafter the Spencer Lumber Company, for the plaintiff, delivered to defendants for transportation from points set out in the petition certain cars of lumber and material for shipment to plaintiff at Selden, N. M. That said cars reached destination, but were delayed en route as per detailed statement attached to the petition. That by reason of said contract and the acceptance of said shipments, and the issuance of bills of lading therefor, the defendant railway companies and each of them became bound to deliver said cars at destination within a reasonable time from the receipt thereof, respectively, but that defendants failed to discharge this duty and delayed the transportation and delivery of each of said cars for an unreasonable time, notwithstanding defendants knew that there would be high water about April, 1907, and that delay would prevent plaintiff from performing his contract, and seriously damage him. That during the delay plaintiff repeatedly notified the agents of defendant companies of such delays and of his contract with the government and the loss that would result from delay. That said companies failed and neglected to advance the delivery of said shipments or try to deliver them within a' reasonable time and allowed many of the cars to stand at Newton, Kansas, and other points for a long period. That but for the negligent delay, and especially in the first shipment thereof, he would have completed the work with which the high water would interfere within the time specified, and before the season of high water in the Rio Grande, and that the work when so completed would have cost plaintiff about $92,078.95, giving him a net profit of $51,000. That by reason of the delays of appellants the actual cost of performing the work was $164,578.95, or a loss to the plaintiff of $21,500. That by reason of said delay in transportation of said material plaintiff employed a man to travel over defendants' roads to locate said material at points where it had been stored away by defendants for an indefinite time, who, after locating same, succeeded in inducing defendants' agents to forward same, and plaintiff paid out to this person the sum of $225. That, by reason of said delay in the delivery of the material, plaintiff was compelled to give his time and attention to said work after April 20, 1907, which was for 11 months, and which was reasonably worth $500 per month, amounting to $5,500. That, by reason of said delay, plaintiff was required to take 11 months longer to complete the contract and that his outfit yielded him no return during said period, to his damage at the rate of 6 per cent. per annum on the sum of $36,000, the cost of the outfit, amounting to $1,980, for which sums he asked judgment against defendants with interest, primarily against the Gulf, Colorado & Santa Fé Railway Company, the initial carrier, or against both defendants jointly.

The defendants answered by general demurrer, general denial, and pleaded specially that, if there were any delays, they were not occasioned through their fault or neglect, but were necessitated by the natural vicissitudes incident to the period of commercial conditions which then existed; that there was an abnormal amount of traffic, which rendered it impossible to transport this material as expeditiously as could have been done under normal conditions of traffic, and the appellant the Gulf, Colorado & Santa Fé Railway Company that it furnished all of the equipment necessary to handle the shipments promptly and transported the same to the end of its line and to its connection and then delivered same to the defendant the Atchison, Topeka & Santa Fé Railway Company and if there were any delays, which were not admitted, the same occurred on the lines of the latter, and that under the terms of the bills of lading under which the ship-

ments were carried each of said lines could only be held responsible for the negligence occurring upon its own lines.

The result of the trial was a verdict for plaintiff against both defendants in the sum of $51,000 as profits with 6 per cent. interest, $21,500 as damages with 6 per cent. interest, and $2,750 as wages, with 6 per cent. interest for 11 months' work.

After Nelson entered into his contract with the government, which was to be completed by April 20, 1907, he arranged to purchase the necessary material, piling, etc., from the A. B. Spencer Lumber Company. A. B. Spencer for him and in his behalf, and at his instance, went to Galveston, called on J. S. Hershey, the general freight agent of the defendant Gulf, Colorado & Santa Fé Railway Company, and made a contract with him on behalf of Nelson for the transportation of the material to Selden, N. M., it being insisted on by Hershey and agreed that Nelson was to ship all the material representing some 70 cars over defendants' lines, thus giving them all of this business. The contract was authorized by the Atchison, Topeka & Santa Fé Railway Company through communication between Hershey and Kuntz, the general freight agent of the Atchison, Topeka & Santa Fé office at Topeka, Kan., at the time, and was acted upon and carried out by the latter company. The testimony and circumstances show that this authorization was by the proper official of the Atchison, Topeka & Santa Fé Railway Company. The contract was not merely an agreement fixing the through rate at 34 cents, but included an agreement on the part of Spencer for Nelson that all the freight would go over the lines of the defendants. The agreement then made, in so far as the rate was concerned, was dependent upon the Interstate Railroad Commission approving the rate which it consented should go into effect after due publication of 30 days, and this low rate became effective for the purposes of the contract on or about January 7, 1907. Except as to the low rate, the contract was in effect when made. Spencer testified that every car of material shipped was shipped under the agreement, and this was not contradicted.

In the negotiations which led to the making of the contract in November, 1906, Spencer made known to Hershey what this material was for, and what had to be done at Selden; that this material had to be moved promptly to Selden, because certain work of damming of the river had to be done before the snows melted, before the river came up, in which event there would be no chance to do anything until the middle of summer, told him about the dam; that the river had to be dammed while the river was down, had to be done in the winter when the river was down; that it had to be done by April; that all the piling material used in the dam

had to be put in the foundation; and that Hershey understood all this when the contract was made.

Selden is a station on the line of the Atchison, Topeka & Santa Fé Railway. There was testimony tending to show knowledge of its officials of this work; and the nature of the materials and their destination and consignee were such as indicated that they were to be used in the construction of the dam and in connection with this contract. That floods in the river occurred regularly in the spring was known to the officials of the Atchison, Topeka & Santa Fé Railway Company, and appears to have been a matter of general information. There was testimony that the floods came in March or April and did not go down that summer, and not until about December. A reasonable time for the transportation to Selden over this route was shown to be 15 to 20 days. One car of needed material for the first work, shipped on November 26, 1906, did not reach Selden until February 13, 1907. Another shipped on December 18, 1906, reached there February 17, 1907. On January 8, 1907, 10 cars of piling were shipped which reached Selden March 5, 1907. There was ample testimony that these failures prevented the work from being completed by April 1st. The government required Nelson to proceed with the work, and he went on with it as best he could. As the result, plaintiff was compelled to give his time and attention to and prosecute the work as best he could under increased cost and difficulties from April 20, 1907, to February 17, 1908, when the contract was finally completed. There was testimony that he sustained damage in the matter of profit on his contract, in the difference between what the construction would have cost him and the contract price, but for the delay complained of, in the amount of $51,000 as found by the verdict. There was also proof that, to complete the contract, he did so at a cost of $164,-578.95, which was $21,500 in excess of the contract price. Also proof of the value of his time for 11 months at $500 per month, after April 1st. There was no delay on the line of the Gulf, Colorado & Santa Fé Railway Company, and all delays took place on the line of the Atchison, Topeka & Santa Fé Railway Company. It was under the contract made with Hershey in November, 1906, that all the freight was shipped and carried to Selden, although it appears that the receipts or waybills provided that the carrier would not be liable except for what occurred on its line. Spencer in making the contract and in shipping it acted for Nelson, and all the freight was paid by Nelson. The testimony shows conclusively that alleged extraordinary traffic conditions on the Atchison, Topeka & Santa Fé lines were not such as rendered impracticable the prompt carriage of this freight, and that it would have

not been delayed if given special attention and preference over other freight, which could have been done.

[1] The first assignment of error presented as a proposition is as follows: "The verdict is contrary to the law, and not supported by the evidence herein for this; that there is no evidence to show that the Atchison, Topeka & Santa Fé Railway Company ever knew of the purposes for which these shipments were being made, or had notice of the special loss or losses that would be sustained by the plaintiff in case of its failure to transport said shipments and deliver same within a reasonable time, prior to and at the time of the receipt of said shipments by it." A separate proposition is: "To fix liability on a carrier for losses under a contract with a third party, especially of anticipated profits, it must be shown that the carrier had notice, at the time of the contract of shipments with it, that such losses would with reasonable certainty follow delay, and of the probable amount thereof and where there is a contract of shipment so called, which fixes a rate for future shipments, to be made from various places and on different dates, such notice should also be given as such shipments are made, or, in case of a connecting carrier, at or about the time of the delivery of the respective shipments to it." With reference to said propositions, we conclude that the testimony and circumstances sufficiently showed that the contract for the transportation of this material was entered into jointly by both defendants for their mutual advantage, through Mr. Hershey, the general freight agent of the Gulf, Colorado & Santa Fé Railway Company, who was such officer of the latter company as was authorized to bind it by such a contract, and who was authorized by the Atchison, Topeka & Santa Fé Railway Company to make the contract on its behalf. We conclude, also, from the evidence that the contract was more than an arrangement of a through rate, that it was a contract whereby said companies secured for their lines exclusively all of the plaintiff's business, and, further, that the fact that Hershey made the contract with information of the use which plaintiff had for this material and for what purpose and of the necessity of prompt delivery of same at Selden and of the nature of the consequence to him, if it was unreasonably delayed, was notice of such facts to both contracting parties, who acted through him as agent in making the contract. We are of opinion that notice of said facts and conditions imposed upon both defendants the contractual duty of forwarding the cars without unreasonable delay, and notified them that undue delay would result in Nelson's damage in reference to the performance of his contract, and that, therefore, liability would ensue for such damages, and

the extent of the damages involved, whether great or small, would not have to be definitely known in order to create the liability.

[2] The point made in the proposition that notice should under the circumstances have been repeated with each shipment, and to the connecting carrier at the time delivery was made to it, is untenable. We think it was sufficient if the shipments of themselves were such as gave notice that they appertained to the contract under which they were shipped. Their nature and their being consigned to J. P. Nelson and the J. P. Nelson Construction Company at Selden, N. M., was sufficient to support a finding of notice of their relation to the contract at the time the shipments came into the possession of the respective carriers.

[3] Under the testimony, this was a joint contract of both carriers, making each liable to the shipper for the default of the other. It is to be noted that, when the contract was made, there was no stipulation that limited the liability of either road to its own acts as a part of it. It is noted also that the testimony, and uncontradicted, shows that all the shipments were made under that contract. 4 Elliott on Railroads, § 1435 et seq.; Hunter v. Railway, 76 Tex. 195, 13 S. W. 190; Railway v. Tisdale, 74 Tex. 8, 11 S. W. 900, 4 L. R. A. 545; Railway v. Williams, 77 Tex. 121, 13 S. W. 637; Railway Co. v. Planters' Gin & Oil Co., 88 Ark. 77, 113 S. W. 352.

[4] This was not a shipment between points in Texas, and therefore not affected by our statutes.

[5] The federal statute, commonly known as the "Carmack Amendment" (Act June 29, 1906, c. 3591, § 7, 34 Stat. 595 [U. S. Comp. St. Supp. 1909, p. 1166]), making the initial carrier liable in interstate shipments, does not, in our opinion, apply where the damage claimed is not in reference to the property itself, which is the subject of the transportation. Here the property was not damaged in any manner. The principles of law which govern this case are those general principles which enter into the common law of carriers. This view requires the overruling of appellant's first and second assignments of error.

[6] The third assignment complains of that part of the charge which instructed the jury to find against both defendants if the Atchison, Topeka & Santa Fé Railway Company prior to the time the shipments were tendered to it had notice through its authorized agent who was authorized to receive such notice, if any, and to accept said shipment, of the purposes for which the material was to be used, and that it was important that same be transported and delivered at destination within a reasonable time, and said Atchison, Topeka & Santa Fé Railway Company failed to transport same with-

in a reasonable time, and that such failure was the direct cause of plaintiff's damage, if any.

The propositions advanced are: (1) That notice of special damages to the Atchison, Topeka & Santa Fé Railway Company at the time it received the shipments was not sufficient, but that it should have had the notice at the time the contract was made. (2) That there was no evidence that said railway company had notice of the necessity of prompt movement of these shipments at or before the time they were tendered to it by the Gulf, Colorado & Santa Fé Railway Company. (3) That it was essential that the local agent receiving the shipments should have been given the notice, and there was no evidence of this.

We think the assignment should be overruled, because, if it had notice through the information Hershey received in the making of the contract, its agents were charged with such notice for the purposes of the contract. With such notice it became its duty to inform its agents sufficiently to enable them to identify these shipments by their character and by the destination and consignee, which was J. P. Nelson, or in some instances the J. P. Nelson Construction Company, Selden, N. M. The testimony of Spencer as to notice given to Hershey was not contradicted. Hershey did not testify. That Hershey undertook to act for the Atchison, Topeka & Santa Fé as well as for the Gulf, Colorado & Santa Fé Railway Company is clear. That he was authorized by the former to act for it in making the contract is a fact that the jury were capable of finding from the testimony. The testimony therefore satisfies the first and second of these propositions. As to the third, it was not necessary under the above circumstances that the local agents of the Atchison, Topeka & Santa Fé Railway Company receiving the shipment should have been given additional notice by the shipper, or by some one for him. The Atchison, Topeka & Santa Fé Railway Company had the notice through Hershey, and, in so far as it is concerned, it must be assumed that it had communicated this information to its agents, through whose hands the shipments might pass, as it should have done, and therefore it was simply a question of fact whether or not the shipments were in such form as would, in the exercise of ordinary care, identify themselves with the subject-matter of the company's contract with Nelson. In this place we overrule also the thirteenth assignment.

[7] The fourth assignment of error is overruled, inasmuch as the refused instruction, in so far as it was correct, was incorporated in the charge given, which is copied under the following sixth assignment.

[8] The sixth complains of this charge: "If, however, you find from the evidence that the Atchison, Topeka & Santa Fé Railway Company did not have notice at or before the time the shipments in question were tendered to it by its codefendant, the Gulf, Colorado & Santa Fé Railway Company, for shipment, of the purposes for which said material was to be used and that it was important that same be delivered at destination within a reasonable time, then it would not be responsible herein for the items of special loss complained of by the plaintiff and your verdict should be for said defendant, the Atchison, Topeka & Santa Fé Railway Company." This charge is not subject to the criticism made of it, that it placed the burden of proof on 'the defendant to show that it had no notice.

[9] The other criticism is that it made this defendant responsible for special damages if the jury found that it had the notice at the time the shipments were tendered, when it should have had the notice before or at the time the original contract was made. There was testimony that the notice was given to Hershey at the time of the original contract and that such notice was notice to the Atchison, Topeka & Santa Fé Railway Company, as heretofore explained, but plaintiff alleged, also, that this defendant had knowledge at the time of accepting the shipments that the Rio Grande river rose every year about the middle of April, and that high water would seriously damage plaintiff in the performance of his contract. Under the testimony, the Atchison, Topeka & Santa Fé Railway Company certainly knew of the contract Nelson had made with reference to the transportation of this material, and that it was to go to Selden, N. M., for J. P. Nelson for use in this construction work. The testimony shows that Selden was a small and unimportant place on said defendant's line, at which this conspicuous public work of damming the river for a vast irrigation project was undertaken. It was a subject of public notoriety, and was shown to be known to be begun and in progress by the officials of said railway, notably by its superintendent of maintenance and operation, who was the Atchison, Topeka & Santa Fé Railway Company's general superintendent, who knew the fact that the river rose in the spring and its consequences upon such work, as that its railroad property had suffered from such cause. Whether or not said company, it having a contract with Nelson to transport all his material in connection with this construction work to Selden, had notice of the importance of prompt delivery there of such material that came to it destined to Selden from the above facts and circumstances, was a question for the jury.

[10] Even if no notice had been given it through Hershey, if notice otherwise came to the Atchison, Topeka & Santa Fé Railway Company before receipt by it of the shipments of the importance of same being carried forward promptly, it would be sufficient

to impose the duty of reasonable diligence in moving the cars and impose liability for the consequences. But notice to Hershey through whom both defendants made the contract, was testified to and not disputed by testimony. Nor was there in our understanding of the testimony and the acts of the parties any real doubt that the contract he made was a joint one duly authorized. The charge was not erroneous.

[11] The fifth assignment complains of the overruling of the motion for new trial because it was necessary in order to fix responsibility upon the Atchison, Topeka & Santa Fé Railway Company that notice of the circumstances making speedy delivery of the material necessary and charging it with losses for special damages growing out of the delay be given to some representative of appellant who was authorized to act for it and there was no evidence showing that Hershey was either an officer, agent, or representative of said defendant, and notice given to him would not fix responsibility upon it. We think the facts and circumstances warranted finding that Hershey made the contract for said defendant by authority from it.

From what has been said herein we overrule the seventh assignment, which is that the court erred in refusing a new trial for the reason that there was no evidence that the Atchison, Topeka & Santa Fé Railway Company had any notice of the use and purposes to which the traffic was to be applied until February 24, 1907, long after the delay had occurred upon its line, and it was shown that immediately after receiving notice of said purpose the cars were forwarded and delivered in a reasonable time. And also the eighth, which contends that there was a total failure to show that Hershey, the general freight agent of the Gulf, Colorado & Santa Fé Railway Company, was such an agent of the other company as to charge it with notice of said purposes, so as to render it liable for the special damages. And in the same connection we overrule the ninth and tenth assignments. It was shown that the duty of general freight agents is to look after traffic and make rates, and secure what he can in the way of shipments. It is well understood that connecting railways can enter into joint contracts for freight. In furtherance of Hershey's arrangement with Spencer, it appears that the two companies applied for, received in due time, and published the 34-cent rate, and the Atchison, Topeka & Santa Fé Railway Company stationed an agent at Selden when Nelson began his work, there having been no agent there before. The circumstances, as well as the testimony of Spencer, show that the contract made by Hershey was the joint contract of these defendants, entered into for their mutual benefit. It being made by Hershey for both defendants, both must be charged with knowledge of the special circumstances affecting this business communicated to him in the making of the contract.

[12] The eleventh and twelfth assignments assert that two shipments were made before January 7, 1907, the date the low rate went into effect, one a car of material shipped on November 26, 1906, and the other car on January 2, 1907, and that there was no evidence to warrant a finding that said shipments were made under the contract with Hershey, and the evidence does not show that Hershey was advised that it was the purpose to make any shipments prior to the taking effect of the rate. It is true that these two cars carried necessarily the then existing rate, which was paid, but, according to Mr. Spencer, all the shipments were made under the contract. It would hardly be a legitimate inference that if Hershey knew at the time of the contract, which was about November 10, 1906, of the circumstance of Nelson's contract, and the necessity of his having material to enable him to go ahead with the work, and that Nelson had a limited time in which to perform same, that he could have assumed that no shipments would be made of material under the contract entered into between him and Spencer until after the low rate went into effect. As matters stood after the said contract up to the date the low rate was fixed, as well as at other times, it seems to us that, if the shipments had been disguised so as not to enable the local agents handling them to identify them as shipments that came within the contract, there would be no liability for delay in forwarding them until specially notified; but if they showed enough upon their face for local agents to identify them, by exercising ordinary care, as material which defendants had entered into contract to carry with dispatch, this was sufficient to notify defendant that they were being shipped under the contract. We have already stated that all of the shipments were in such form as could readily be seen therefrom that they were for Nelson at Selden and of material appropriate and unmistakable for use in the construction of the dam. Besides this, Spencer testified that the agreement between Hershey and himself covered shipments of the material to be used in the diversion dam, which constituted these shipments. He testified that all the shipments were made under the agreement.

[13] From the fourteenth assignment it appears that not all of the shipments began on the line of the Gulf, Colorado & Santa Fé Railway Company, but that on December 18, 1906, another railway company, the Gulf, Beaumont & Kansas City Railway Company, issued its bill of lading for 45 pine poles for delivery to J. P. Nelson at Selden, N. M.; and on January 8, 1907, bills of lading for ten cars pine poles for delivery to J. P. Nelson Construction Company, Selden, N. M.;

and on February 1, 1907, bills of lading for three cars material for delivery to J. P. Nelson Construction Company at Selden, N. M.; and on February 15th a bill of lading for one car of pine poles, for delivery to J. P. Nelson Construction Company, at Selden, N. M., and on various other dates bills of lading in like form. The point made in reference to these particular shipments is that defendants had no notice that any shipments would originate at points on said line of railway and that bills of lading would issue by such company, or that any shipments had been made over such line, and there being no evidence that any agent of said line ever received any notice which would make that line responsible for damages of a special character, or that any such notice was ever given to any representative of either of these defendants, the evidence was insufficient to warrant the submission of any issue thereon to the jury, and the court erred in failing and refusing to set aside a judgment based in whole, or in part, on said shipments. This assignment and also the fifteenth we overrule for the reason that it was not contracted that shipments should originate on the lines of defendants, but the contract was to carry over the lines of defendants all of Nelson's material, and these shipments fell within what was contracted for, and the form in which they were shipped and billed showed enough to identify them as such.

The sixteenth assignment complains of that paragraph of the charge which told the jury that defendants would be liable for any special damages claimed by plaintiff resulting from delay in reference to the shipments that came from the Gulf, Beaumont & Kansas City Railway Company, unless the jury found that defendants knew at the time said shipments were accepted by them that it was a part of and included in the contract of shipment for the completion of the Nelson contract, and was, in fact, intended for J. P. Nelson for such purpose, and that it was important that the same be delivered within a reasonable time. We overrule this assignment, and also the seventeenth, eighteenth, and twenty-ninth assignments, from what has been said, especially in connection with the next preceding assignment.

We overrule the nineteenth, for the reason that the charge complained of did not impose the burden of proof on account of anything that is shown by the brief in connection with the assignment.

We overrule the twentieth, twenty-first, twenty-second, twenty-third, twenty-fourth and thirty-first assignments. We do not mean to declare that some of the propositions stated by appellant under these assignments are not sound. They are all directed to the act of Congress known as the "Carmack Amendment," which we have already held does not affect shipments, except in respect to damages to the property shipped, and here there was no damage or injury to the property charged or proven. The liability of defendants depends upon the ordinary rules of law in reference to contracts by common carriers.

[14] The twenty-fifth, twenty-sixth, twenty-seventh, and thirtieth assignments are that the verdict is without evidence to support it and a new trial should have been granted, because the bill of lading issued by the defendant Gulf, Colorado & Santa Fé Railway Company limited its liability to loss or injury occurring on its own line, and the testimony was that no delay occurred on its line. This we overrule because it was liable for what occurred on the line of the other contracting defendant in the case of a joint contract. The contract imposing such liability, the bills of lading or shipping receipts did not operate to restrict that liability. Caldwell v. Felton (Ky.) 51 S. W. 575.

The twenty-eighth is overruled because the burden of proof was not placed upon the Gulf, Colorado & Santa Fé Railway Company as alleged.

[15] The thirty-second assignment complains of the refusal of a charge: "If you find that any of the cars of material were sold to plaintiff at a delivered price at destination, then plaintiff will not be entitled to recover anything growing out of the transportation of such cars." This is briefed as a proposition of law in itself, but we do not consider it as such. This of itself requires the assignment to be overruled. But, in addition, all that is stated in the brief under the assignment as its basis is an extract from a deposition of Nelson which reads: "I left the matter of making the contracts for the shipment of the lumber to A. B. Spencer, because I was to pay him a delivered price." This did not say that he was to pay the Spencer Lumber Company a delivered price at Selden. Nelson's testimony otherwise shows that he testified specifically that "the lumber was not to be delivered by the Spencer Lumber Company at Selden, N. M., freight paid. The terms of the contract were that he was to give me a general price at the mill, and he should superintend, see that it was shipped, and whatever expense he would be to he would add."

[16] The thirty-third assignment complains of the refusal of a new trial because "the evidence shows without dispute that much of the delay in the delivery of this traffic at destination was occasioned by the neglect of the A. B. Spencer Company or A. B. Spencer to ship same promptly, and much of the delay was caused by the willful act of A. B. Spencer in withholding said shipments awaiting a reduction in the freight rate until after January 7, 1907, when the same was permitted to be put in force by the Interstate Commerce Commission." The undisputed testimony was not as claimed in this assignment. It was for example testified to by Nelson, in substance, that he directed Spen-

cer to ship first what he needed for the foundations of the dam, in order that he could finish certain work in the river before high water came; and that, if this was finished in time, the rest of the work could proceed without involving unusual expense. The first shipments referred to were those in November, December, and January, which Spencer shipped as requested. Nelson testified: "The effect of the failure to deliver the cars I ordered in November, December, and January upon my ability to complete the dam before high water in the river was that it absolutely prevented me from doing it. * * * Without the material contained in the November, December, and January shipments, I could not do any work in the river channel until they arrived there, because that was the foundation—that was what all the balance of the dam stood on." Spencer testified, in substance, that he shipped out the above as promptly as could be done. He stated: "We had all this material ready right around by January 7th. We got all that out, material enough to do this part of the work that he needed first and then we let the other come along gradually, because that would keep him busy doing that part of the work needed first, where the water would bother and delay the work." Nelson testified: "The balance of the work, of the dam, the balance of the dam, was on high ground that didn't overflow at all, and could be done at any time later, in case of any delay, without extra expense." Nelson further testified: "Had I received my material within 20 or 30 days *after it was shipped*, I could and would have completed that work before high water." In view of the testimony, there was no error in refusing a new trial for said ground.

We overrule the thirty-fourth, for the reason that Nelson appeared to be qualified to testify to the number of days it should take a loaded train to go from Silsbee to Selden.

[17] The thirty-fifth complains of certain of Nelson's testimony, stating, in effect, that, with a view of getting speedy delivery of the material just as soon as he received notice of cars shipped, he informed the local agent at Selden of the car and its number and when shipped, and urged him to trace the cars and of the necessity of having the lumber, that he was waiting for it, that every thing was delayed, and to try and hurry it up. The objection was that this testimony was immaterial, being notice given to the agent at destination.

Under the charge, the notice of special circumstances involving damages recoverable was notice to defendant itself or to some duly authorized agent authorized to receive such notice prior to the acceptance of the material for shipment, in so far as the Gulf, Colorado & Santa Fé Railway was concerned. As to the Atchison, Topeka & Santa Fé, the charge required such notice through its duly authorized agent authorized to receive such notice and to accept the shipment prior to the time the shipments were tendered to it by the Gulf, Colorado & Santa Fé Railway Company. All the evidence shows that the shipments were promptly delivered to the Atchison, Topeka & Santa Fé Railway Company by the latter. Inasmuch as this testimony related to the defendant, the Atchison, Topeka & Santa Fé Railway Company, and the charge limited the effect of notice to its agents to such agent as accepted the shipments, the jury must have understood that notice of special circumstances given to a local agent at the point of destination was not of any effect. Hence we think the testimony could not have prejudiced the case. However, it seems clear that the testimony which shows that Hershey was agent of both defendants when he made the contract testified to by Spencer, whose testimony was not contradicted by Hershey or any one else, and that he, for them, received notice of the special circumstances which was sufficient. Besides, the testimony was proper on the issue of Nelson's contributory negligence.

We overrule the thirty-sixth, because we have already held that Hershey was the agent of both defendants in entering into the contract.

The thirty-seventh, thirty-eighth, and thirty-ninth assignments are overruled. There was no error in the rulings complained of in them.

[18] The fortieth assignment complains of the refusal of this charge: "If you find and believe from the evidence that said shipments or any of them were delayed en route, and if you further believe that said delays were caused wholly and solely by reason of the unexpected and unprecedented business which was tendered to the defendant Atchison, Topeka & Santa Fé Railway Company, if you find that such condition existed, provided that said railway company had exercised care to ascertain the demands which would be made upon it for the carriage of freight and had exercised ordinary care to handle the same, and that notwithstanding said care the business so tendered and which it was called upon to handle was unprecedented, then neither of the defendants would be responsible for any delays occasioned thereby." The contract was entered into with knowledge of facts requiring that the material shipped under it be carried through promptly. This required preference to be given these cars in transporting them. An unexpected and unprecedented business at the time would be no excuse for not advancing their movement. T. & P. Ry. Co. v. Felker, 40 Tex. Civ. App. 604, 90 S. W. 530, and cases there cited. Mr. Parker, general superintendent of the Atchison, Topeka & Santa Fé Railway Company, testified: "If Mr. Nelson, or his representative, had seen me personally and talked to me and told me what

kind of a fix he was in, I would have used my best endeavors to help him out. No question but what we could have gotten them out." The instruction was correctly refused.

From what has been said in this opinion we overrule the forty-first assignment of error.

[19] The forty-second assignment complains of the refusal of a new trial as follows: "The verdict should be set aside and a new trial granted herein because much of the delay in the completion of the work upon the Nelson contract, for which it is sought to hold these defendants, was occasioned through the acts of Nelson and his agencies, by reason of defective machinery, by labor troubles, and other conditions over which these defendants had no control, and, while such delays as may have occurred upon the line of the Atchison, Topeka & Santa Fé Railway Company may have contributed in a measure to the delays in the completion of his contract, the amount of such contribution by these delays is so blended with the delays that were occasioned by Spencer, the Creosoting Works, defective machinery, labor troubles, etc., that it is impossible for the jury or the court to accurately charge the defendants with liability for the entire losses claimed to have been sustained by Nelson and for his failure to complete his contract in time." The statement in the brief, under this assignment, of testimony relied on in support of it, does not mention "Spencer" or "the Creosoting Works." It refers to labor troubles, defective machinery, and improper management. There were two charges asked by defendants, which were given. One was that defendants were not responsible for delays of A. B. Spencer, if any, in postponing and tendering the freight for shipment; and another was that defendants were not responsible for delays, if any, of the Creosoting Works. The testimony cited in support of the assignment went to show that Nelson could not have finished the dam before high water, even had there been no delay in delivering the material at Selden; that his machinery was defective and inadequate for the purpose; that some delay ensued from labor troubles and from bad management on the part of Nelson.

When we turn to Nelson's testimony, we find he testified that he had ample time to do the work, if he could have gotten the material there before the high water, and within the time limit of the contract. "As soon as I received the telegram that the contract had been awarded me, I wired the A. B. Spencer Co. to ship certain material. This material was to be used for pile drivers and for the bridge across the river. The purpose of fixing April 5th for the time of completing the contract was in order that it might be finished before high water, and I had ample time to have completed it within that time, if I had got the original bills of lumber I or-

dered." This referred not only to the foundation work of the dam, but to the canal that was included in his contract with the government. "Had I received my material within 20 or 30 days after it was shipped, I could and would have completed that work before high water," referring to work in the main river channel. The jury had the right to credit Mr. Nelson, and, if they found that he could have accomplished what he stated after the material was shipped, they would necessarily have found the delays in shipping were not the cause of his failure to complete the work in time.

The witness Rhead, the government inspector, testified that the nonarrival was undoubtedly one of the principal reasons for Nelson not completing the dam before the high water came. He also testified that Nelson made very satisfactory progress until after the floods interfered with the work; that the material he did not receive, on account of which Mr. Nelson was delayed, was round and sheet piling principally. He also testified that some of the machinery used by Mr. Nelson was old in appearance, but worked satisfactorily for the purpose used. Nelson testified: "I would have driven the piles and built the dam, and the whole thing I figured ought to have completed the dam and do it in 60 days, the whole business. * * * Yes; as a contractor I say it was practical to have done it in that time." Other witnesses testified to the sufficiency of Nelson's machinery. The testimony of Nelson is lengthy, but it went to negative that his management was bad. As to labor troubles, Nelson testified that that he never had a great deal of trouble with laborers; that he never worked in many places where he had as little trouble with labor; that, if one man did not do a thing and quit, he would go to El Paso and get more, trouble practically none. Other witnesses testified that the trouble with labor was insignificant.

[20] It is true that upon all these matters the testimony was conflicting. Our conclusion as to the weight of the evidence and the credibility of the witnesses cannot be substituted for that of the jury.

[21] The forty-fourth assignment complains of the refusal of a new trial upon the ground of gross excessiveness of the verdict. The assignment alleges that the verdict makes defendants responsible for the entire loss sustained by plaintiff. This is not so, but it is true in the sense that the verdict awarded plaintiff all that he claimed in his pleadings in respect to the matters submitted. Appellant contends that it is clear that there were many causes contributing to the losses alleged to have been sustained and that many of these causes were not such that defendants were responsible therefor, even admitting defendants' delay in delivering material. The assignment specifies these causes: (1) That there was considerable de-

lay on the part of plaintiff in tendering the shipments for carriage. The testimony of Spencer negatives any unreasonable or unnecessary delay in this matter, and negatives that this was a cause of Nelson's failure as we have shown. (2) It was affirmatively shown that much of the machinery employed by Nelson was unsuitable or out of repair. There was testimony contradicting this, as we have shown. (3) That it was shown that there was a defect in the organization of Nelson's forces, that there was no harmony in the superintendence of the work, and that there was at times a shortage of help. All these matters were before the jury on conflicting testimony. (4) That the government superintendent required him to do the work in a more expensive manner than was by Nelson considered reasonable and proper. The place in the record where such testimony is to be found is not pointed out. But, assuming such testimony existed, Nelson's contract with the government in case of his default placed him at the mercy of the government in reference to his continuation of the work. (5) The evidence shows that the plaintiff was unfamiliar with the character of rise which would occur in the Rio Grande, that he seriously underestimated the character and extent thereof, and did not take into consideration the inability to do work in the bed of the stream during high water, and failed to take the precautions that a man familiar with the situation would have taken to guard against loss occurring therefrom. There was testimony which went to negative all of these facts. (6) That the evidence shows conclusively that one-third of the cars containing material originated at a point on another line of railway, and were not consigned to plaintiff J. P. Nelson, and there is nothing in the evidence to show that either of the defendants had any notice that such shipments were intended for use on this contract. It is true that a number of the cars of material originated and were billed on the line of a different railway by which they were delivered to the Gulf, Colorado & Santa Fé Railway Company, and by the latter to the Atchison, Topeka & Santa Fé Railway Company. It is true, also, that they were billed to be delivered to J. P. Nelson Construction Company, at Selden, N. M. We have already given this matter consideration and arrived at the conclusion that whether or not the defendants, respectively, had notice from the character of the material and to whom and where it was destined, that the same applied to the contract that they had made with Nelson was a question for the jury. We think it was clearly the duty of both defendants, after they had made the contract, with notice of the importance of prompt carriage of the material contracted to be carried, and the consequences of delay, involving damage to Nelson, to see to it that its agents, through whose hands such shipments would pass, were notiand they ought not to be heard to say that their contract would be properly carried out; and they ought not to be heard to say that their station or other local agents should have been specially informed of the facts by plaintiff in connection with each and every shipment, if the character, consignee, and destination of the shipments were such as would identify them, to a reasonably prudent person, as pertaining to said contract. We think the assignment should be overruled.

From what has been said in the course of this opinion we overrule the forty-fifth, forty-sixth, forty-seventh, and forty-eighth assignments.

The forty-ninth is overruled, as the testimony did not involve double recovery.

The fiftieth and fifty-first are overruled. Under Nelson's contract with the government, the latter had the right to forfeit his material and complete the contract at his expense upon his making default. The government did grant him extension from time to time until the contract was completed in 1908, but in connection with the extensions the government required him to prosecute the work, under the adverse conditions, as it had the power to do.

[22] His testimony to the effect that he asked the government's engineer to permit him to wait until normal conditions, but that this official refused, was not improper, as it showed diligence on his part to avert damages, and that the course he pursued arose from the exigencies of his contract.

The remaining assignments, the fifty-second to fifty-sixth, inclusive, are overruled.

[23] Nelson has a cross-assignment of error in his brief complaining of the nonallowance by the trial court of interest on the item of $51,000 damages allowed by the jury from April 18, 1907, the date he would have completed the contract but for defendant's delay, and in not allowing interest on the items of $21,500 and $2,750 damages from February 14, 1908, the date he completed his contract.

We find no evidence of the filing of the cross-assignment in the trial court, or of its being filed here by consent, and therefore do not consider it. O'Neil v. Sun Co., 123 S. W. 172.

Judgment affirmed.

### On Motion for Rehearing.

We understand the petition to charge among other things liability of both defendants on the theory of a joint contract for the transportation of the material.

The theory of liability submitted by the court was whether or not the Gulf, Colorado & Santa Fé Railway Company contracted with Nelson (through Spencer) for a through shipment of this material over the lines of both defendants, and whether or not both com-

panies through an authorized agent had notice at or before receiving the shipments of the special circumstances making prompt carriage necessary. It was competent for the court under the petition and the testimony to submit the case in this manner, and, if the evidence developed the fact to be that the contract made by the Gulf, Colorado & Santa Fé Railway Company for a through shipment was really the contract of both companies, notice of such circumstances to the Gulf, Colorado & Santa Fé Railway Company was notice to the Atchison, Topeka & Santa Fé Railway Company. The matter of notice to the latter company was established by notice to Hershey if the contract he made in his capacity as general freight agent of the Gulf, Colorado & Santa Fé Railway Company was binding as the contract of the Atchison, Topeka & Santa Fé Railway Company. Of course, any notice he received in the making of the contract was notice to the Gulf, Colorado & Santa Fé Railway Company; and, if the two companies were operating in the transaction of their business as one, notice to Hershey was notice to the Atchison, Topeka & Santa Fé Raiway Company. The contract and the information imparted at the time was one means of proving notice to both parties.

We think it advisable to make it more plain than we have done in the main opinion why we think there was testimony which warranted the jury in finding that there was a joint contract, by which each of the railway companies became liable for the defaults of the other. It would probably be going too far to hold that, when Hershey telegraphed to Kuntz, he explained the proposed contract and the circumstances connected therewith, and obtained a reply authorizing him to enter into the contract he made in behalf of the Atchison, Topeka & Santa Fé Railway Company. Such a finding would be based on conjecture. There is no doubt in our minds of the sufficiency of the testimony to show that Hershey made a contract with Spencer to secure the hauling of all of Nelson's material, on behalf of both defendants, if Spencer's testimony is to be given effect.

[24] The fact that he made such a contract would, of course, not be of itself sufficient evidence of his authority to make it on behalf of the Atchison, Topeka & Santa Fé Railway Company upon the familiar principle that agency cannot be established alone by the acts or declarations of the agent, though the same may be a circumstance, which, in connection with other circumstances, may be considered in proving agency. Railway v. Cunningham, 51 Tex. Civ. App. 368, 113 S. W. 775. We find other evidence in the record of the fact of agency. The Atchison, Topeka & Santa Fé Railway Company and the Gulf, Colorado & Santa Fé Railway Company are frequently referred to in the testimony as the Santa Fé lines, or

Santa Fé System. The witness Hurley, general manager of the Atchison, Topeka & Santa Fé Railway Company, testified that the two companies are operated separately with separate vice presidents and general managers. The plain inference is that the two companies had the same president. Mention is made of the Atchison, Topeka & Santa Fé Railway Company being the "parent company," and Spencer gave the direct testimony that they are under the same system as far as handling their business is concerned.

[25] Upon this testimony it could be properly found that the Gulf, Colorado & Santa Fé Railway Company was authorized to make contracts for through shipments of freight over its own and the line of the Atchison, Topeka & Santa Fé Railway Company and bind the latter as well as itself thereby. Ordinarily to make proof of the existence of such relations between connecting carriers as to make each the agent of the other, circumstantial evidence must be resorted to from necessity, but here we have direct testimony to the effect that these two companies were really one in respect to the handling of their business.

As broadly stated in Railway v. Wells, 24 Tex. Civ. App. 309, 58 S. W. 844: "The fact, legitimately inferred from the evidence, that the defendant was operated in connection with the Missouri, Kansas & Texas Railway and was part of the system rendered it liable for the acts of the system and every part thereof and the declarations and representations of agents of the Missouri, Kansas & Texas Railway Company would be the acts or declarations of the defendant." And as stated in Buie v. Railway Co., 95 Tex. 66, 65 S. W. 31, 55 L. R. A. 861: "The authorities cited fully sustain the proposition that when one corporation makes use of another as its instrument through which to perform its business, the principal corporation is really represented by the agent of the sub-corporation and its liability is just the same as if the principal corporation had done the business in its own name." The result is that the Gulf, Colorado & Santa Fé Railway Company had authority to bind the Atchison, Topeka & Santa Fé Railway Company by just such a contract as Spencer testified was made by it through its general freight officer, Hershey, without having to obtain the special consent of the latter thereto; that Hershey was capable of making the contract for it as well as for his own company, was agent for both in making it, and consequently what information or notice he had in reference to the subject-matter was information and notice to the Atchison, Topeka & Santa Fé Railway Company. The substance of the testimony of Spencer was that Hershey made the contract with him to put in effect, or proceed to put in force, the special rate of 34 cents to Selden, N. M., in consideration of these companies getting:

all of Nelson's freight. If such was the contract, Nelson was obligated to ship all his materials over their lines; he paying the regular rate until the low rate became authorized by the commission. There was delay in putting the rate on, due chiefly to the action of the commission. In the meantime it was necessary to have some of the material at Selden for this work, and what was so shipped was shipped over defendant's lines, and, if Spencer was believed, under the contract he had made with Hershey. There was some conduct on the part of Spencer which was not wholly consistent with the fact that a contract had actually been made, as he testified to. But this was a question of fact. If there had been no contract requiring all of the freight to be sent over defendant's lines, or Spencer did not consider Nelson bound to do so, it is more than probable that the cars that were shipped before the rate went into effect would have been sent over another shorter and more expeditious route. The very fact that he used defendant's longer route paying regular rates would indicate that he did, as he stated, ship these cars under the contract. The matter of Spencer's testimony on this subject was one for the jury.

While the testimony on some material points in this case is not convincing, we think there was sufficient to authorize finding that Spencer and Hershey made the agreement as testified to by Spencer, which was a joint contract complete in itself concerning this transportation, binding on both defendants, and making each liable for the acts of the other in respect thereto; that both defendants had notice through Hershey of the circumstances making necessary the prompt delivery of the material at Selden, and of the danger of special and serious loss to Nelson in case of unreasonable delay.

With this explanation we conclude that appellants' motion for rehearing should be overruled.